**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 6, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KELLY DALCOUR, and JURITA
AVRIL,

      Plaintiffs-Appellants,

v.

CITY OF LAKEWOOD, RON BURNS;
JENNIFER GILLESPIE; MARISSA
CORDOVA; JOHN GRIFFITH; JAMES
R. JONES; KRISTOPHER DEROEHN;
SCOTT WEICHERT; PATRICIA
BUDDY,

      Defendants-Appellees.

No. 11-1117

(D.C. No. 1:08-cv-00747-SJJ/MSK-KLM)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE,** Chief Judge, **GORSUCH** and **MATHESON**, Circuit Judges.

---

Kelly Dalcour and Jurita Avril (Plaintiffs) appeal the dismissal of their 42 U.S.C. §

1983 claims against Lakewood, Colorado, Police Agent Jennifer Gillespie and Sergeant

John Griffith (together, the Officers),[1] and Patricia Buddy, a Jefferson County, Colorado,

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] Lakewood City refers to its police officers as "agents." We refer to agents in keeping with Lakewood City custom, but refer to groups that include sergeants or other

(continued...)

Division of Youth, Children, and Families caseworker, in their official and individual capacities. The § 1983 claims arise from a "welfare check" by the police executed at the Plaintiffs' home, which resulted in the temporary removal of the children from the home and Avril's arrest and conviction for resisting arrest and obstructing a police officer. Plaintiffs argue the district court erred in dismissing their official-capacity claims against Buddy and in granting summary judgment to Buddy and the Officers on all other claims. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm in part, reverse in part, and remand for further proceedings.

I.

In July 2006, Dalcour (husband) and Avril (wife) lived together in Lakewood, Colorado, with two children, Minor Child I (MCI) and Minor Child C (MCC). On July 30, 2006, MCI attacked and injured Avril and stabbed Dalcour. Police took MCI into custody and placed MCC into temporary foster care with the Jefferson County Division of Youth, Children, and Families (JCDYCF). The JCDYCF filed a Petition in Dependency and Neglect (D&N Action) concerning both of the Plaintiffs' children. The state court allowed the children to return home with Avril but placed them under protective supervision.[2] The court also orally ordered Dalcour to avoid the family home

_____

[1](...continued)
non-agent ranks as "officers."

[2] "'Protective supervision' means a legal status created by court order under which the child is permitted to remain in the child's home or is placed with a relative or other suitable person and supervision and assistance is provided by the court, department of

(continued...)

2

and to "have no contact with [the] children." Aplt. App. at C-0020, 0032, 0092–93.

Dalcour was not present when the district court issued this order.[3] MCI's bond conditions also established that she was not to have contact with Dalcour and that Dalcour was not to reside in Avril's home.

At an advisement hearing on August 28, 2006, Avril agreed to continued protective supervision of the children by JCDYCF, although the children remained in her physical custody. Also at that hearing, Plaintiffs, who were both present, requested that the order preventing Dalcour's return to the home be withdrawn. The state court observed, however, that even if it were to vacate its prior order, the conditions of MCI's bond required that Dalcour have no contact with MCI and no access to the home. To resolve the Plaintiffs' request, the court ordered another hearing on September 26. The court did not vacate its prior order, which barred Dalcour's access to the home and his family. Nevertheless, by September 19, Dalcour had returned to the home and appeared to be living there, in violation of the court's order.

On September 19, believing that Dalcour might have returned to the home in

---

[2](...continued) human services, or other agency designated by the court." Colo. Rev. Stat. § 19-1-103(87).

[3] The court's minute orders restated its oral rulings directing that the children have no contact with Dalcour and also imposed protective supervision by JCDYCF, although the no-contact order was never served on Dalcour, and a Colorado court ultimately ruled it invalid. Tr. of July 18, 2007 Hr'g at 46–47, People v. Dalcour, No. 06-M-6026 (Jefferson Cnty., Colo. D. Ct. 2007). Nevertheless, the record does not indicate that anyone believed that the order was invalid during the events relevant to the case at hand.

violation of the court's order, Buddy, the JCDYCF caseworker assigned to the case, requested that the Lakewood Police perform a welfare check to determine if Dalcour was in the home. Lakewood Police Agent Jennifer Gillespie responded to the request. Before approaching the home, Agent Gillespie called Buddy for more information, but the parties disagree as to what exactly they discussed. Agent Gillespie initially said that Buddy told her that Buddy would come to the home to remove the children if Dalcour was in the home,[4] but Agent Gillespie later said she understood that the existing no contact order authorized her to enter the home and remove the children herself if Dalcour was present in the home.

After arriving at the Plaintiffs' home but before knocking on Avril's door, Agent Gillespie heard an adult male voice inside the home, although it is unclear whether she recognized the voice as Dalcour's.[5] Agent Gillespie knocked on the door, and Avril answered, opening the door just wide enough to talk to Agent Gillespie and Agent Gillespie's partner. Avril, angry to find the agents at her door, refused to answer questions about Dalcour or to allow the agents to enter her home. Before Agent Gillespie was able to determine whether Dalcour or the children were in the home, Agent Gillespie put her foot in the doorway to keep Avril from shutting the door. An altercation at the

---

[4]Agent Gillespie's Incident Report also stated that Buddy told her to contact her if the children were in the home, so that Buddy could come to the home and remove them.

[5]At her deposition, Agent Gillespie first stated that she recognized the male voice as Dalcour's based on her interaction with him after the stabbing incident, but then she later stated that she did not recognize the voice as his.

door ensued, and Agent Gillespie called for additional officers. Before the additional agents arrived, Agent Gillespie confirmed Dalcour's presence in the home by speaking to him through the partially closed front door. She also heard children crying in the home.

Sergeant Griffith and three other agents arrived to find Avril attempting to force the door closed, slamming it against Agent Gillespie. Agent Gillespie told Sergeant Griffith that there had been a prior stabbing at that home,[6] that a no contact order was in place for Dalcour and the children, that both Dalcour and the children were in the home, and that "social services would respond immediately to take emergency custody of the children if [Dalcour] was on site." Id. at B-0152.

Based on these facts and the ongoing struggle at the door, Sergeant Griffith ordered a forced entry into the home. After the agents pushed the door open, Avril shut herself in a bedroom with her children. The agents broke down the door to the bedroom and then attempted to arrest her. The four officers attempting to arrest Avril were unable to handcuff her, so Sergeant Griffith eventually tased her at least once and perhaps up to three times to effect her arrest.

Shortly after the agents arrested Avril, Buddy arrived at the home and took the children into protective custody pursuant to an ex parte oral protective custody order.[7] Avril was convicted of resisting arrest and obstructing a police officer and served 100

[6] Sergeant Griffith appears to have misunderstood the circumstances of the prior stabbing and believed that Dalcour had been the perpetrator, not the victim.

[7] The children remained in protective custody until May 2007, when the state court allowed them to return home with their mother.

hours of community service.

*District Court Proceedings*

In August 2008, Plaintiffs filed an amended 42 U.S.C. § 1983 claim against Buddy and the Officers, in their official and individual capacities.[8] Id. at A-0076. Plaintiffs asserted the following claims against Buddy and the Officers:

1. Use of excessive force in violation of the Fourth Amendment.

2. Unreasonable search and seizure in violation of the Fourth Amendment.

3. Interference with parental rights in violation of substantive due process under the Fourteenth Amendment.

Plaintiffs sought compensatory and punitive damages and injunctive relief.

Buddy moved to dismiss all claims against her for failure to state a claim under Fed. R. Civ. Proc. 12(b)(6). The district court dismissed all three claims against Buddy in her official capacity after concluding Plaintiffs had failed to allege that Buddy acted pursuant to an official municipal policy or custom. The court also dismissed the excessive force claim against Buddy after concluding Buddy did not cause the alleged use of excessive force. The court denied Buddy's motion with respect to the unlawful search and seizure claim brought against her in her individual capacity. The court concluded that Plaintiffs had alleged facts sufficient to show Buddy's statement to Agent Gillespie caused the officers to search the Plaintiffs' home. The court granted Buddy's motion to

---

[8] Dalcour and Avril filed suit against several other defendants, but they do not appeal the district court's decisions regarding those defendants.

dismiss the interference with parental rights claim, concluding she was entitled to qualified immunity because "the Tenth Circuit did not clearly recognize a right to familial association applicable to these circumstances." Id. at 12–13. As a result of these rulings, the only claim remaining against Buddy was an unreasonable search and seizure claim which was brought against Buddy in her individual capacity.

The Officers also sought summary judgment on all claims brought against them in their individual and official capacities. The district court granted summary judgment on the official capacity claims against the Officers, based on the lack of evidence that an official policy or custom had resulted in the alleged violations of Plaintiffs' constitutional rights. The court also granted the Officers summary judgment on the unreasonable search claim, concluding that the officers had a reasonable belief that exigent circumstances justified their entry into the home. The court denied the Officers' motion for summary judgment with respect to both Plaintiffs' seizure and unreasonable force claims, ruling that both claims involved disputed facts best resolved at trial. Last, the court granted the Officers qualified immunity on the familial association claim, reiterating its earlier conclusion that the Tenth Circuit had not clearly recognized a right to familial association in these circumstances. Thus, the only remaining claim against the Officers was the Plaintiffs' claims "for unconstitutional seizure and use of excessive force."

Finally, Buddy moved for summary judgment on the remaining unreasonable search and seizure claim. Based on its prior ruling that the search by the Officers was reasonable, the court granted summary judgment for Buddy on the unreasonable search

7

claim. The court further determined that Buddy was not responsible for any alleged illegal seizures and granted her summary judgment motion in its entirety.

Before jury selection on the claims of unconstitutional seizure and use of excessive force by the Officers, the district court ruled on several motions in limine, including Plaintiffs' motion alleging spoliation of evidence related to the city's TASER logs. The TASERs used by the Lakewood City police record each use, and Lakewood requires officers to log any use of a TASER on a person. In this case Sergeant Griffith, who was responsible for preparing the log, was unable to print out the log due to a computer error. During discovery, Plaintiffs repeatedly requested a printout of all the TASER logs from the date of the arrest, but the logs the city produced did not include any information related to the TASER use on Avril. Plaintiffs alleged that the city's failure to produce the relevant TASER log amounted to spoliation of evidence, entitling them to an adverse jury instruction that Avril was tased three times, or, in the alternative, a jury instruction that "the jury 'may' presume that the evidence was intentionally destroyed." Id. at C-0249. The district court denied the motion in limine, but did allow Plaintiffs to question witnesses about the missing evidence. The jury found for the Officers on all claims.

## II.

Plaintiffs timely appealed the dismissal of all official capacity claims against Buddy: the grant of summary judgment on the illegal search and familial association claims against Buddy and the Officers, and the spoliation of evidence ruling. Plaintiffs

8

argue that:

1.  The district court erred in finding Plaintiffs had not adequately pled that a city policy or custom was the moving force behind Buddy's constitutional violations, resulting in the improper dismissal of the official capacity claims against her.

2.  The district court erred in finding that exigent circumstances justified the warrantless search.

3.  The district court erred in finding that the Buddy and the Officers had not violated a clearly established constitutional right to familial association under the circumstances in the case.

4.  The district court erred in not instructing the jury that they should presume Avril was tased three times, based on her spoliation of evidence argument.

> *A.  Plaintiffs did not adequately plead that a city policy or custom was the moving force behind Buddy's alleged constitutional violations.*

We review de novo the court's dismissal of the official capacity claims against Buddy, taking as true all of the Plaintiffs' well-pled factual allegations.[9]  "[T]o withstand a motion to dismiss, a complaint must have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'"  Kansas Penn Gaming v. Collins, 656

---

[9] Plaintiffs argued that the court should apply the outdated Rule 12(b)(6) standard from Conley v. Gibson, 355 U.S. 41, 45-46 (1957) ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.").  But the Conley formulation "has earned its retirement."  Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 563 (2007).  We apply the standard explained in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), and Twombly, 550 U.S. 554.

F.3d 1210, 1214 (10th Cir. 2011) (quoting Twombly, 550 U.S. at 570). "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." Id. (quoting Twombly, 550 U.S. at 555). To survive a motion to dismiss, an official capacity claim must allege sufficient facts to show that a specific policy or custom was the moving force behind the alleged violation. Kentucky v. Graham, 473 U.S. 159, 166 (1985) (citations omitted).

Plaintiffs fail to support their official capacity claim. Their only supporting allegation is that, "[a]t all times referred to herein, [Buddy and the Officers] acted under color of the laws, statutes, ordinances, regulations, policies, custom, and usages of the state of Colorado, the City of Lakewood, and/or Jefferson County." Aplt. App. at A-0077. Plaintiffs do not identify which specific policies or customs may have motivated Buddy's actions. Without more, this is exactly the "formulaic recitation of the elements of a cause of action [that] will not do." Twombly, 550 U.S. at 555. We thus affirm the district court's dismissal of the claims against Buddy in her official capacity.

> *B. The court erred in finding that exigent circumstances justified Agent Gillespie's initial warrantless intrusion into the home, but not in finding that exigent circumstances justified the later forced entry. Buddy's role in any unconstitutional entry or search was at worst negligent, and we affirm the court's ruling granting her qualified immunity.*

We review the grant of summary judgment de novo, applying the same standards as the district court, pursuant to Federal Rule of Civil Procedure 56(c). Salazar v. Butterball, 644 F.3d 1130, 1136 (10th Cir. 2011). We affirm summary judgment if the

10

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). See also Grynberg v. Total, 538 F.3d 1336, 1346 (10th Cir. 2008). "An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way" and a dispute "of fact is material if under the substantive law it is essential to the proper disposition of the claim." Thom v. Bristol–Myers Squibb Co., 353 F.3d 848, 851 (10th Cir. 2003) (internal quotation marks omitted).

Plaintiffs argue that the district court erred in determining that exigent circumstances justified a warrantless entry of the home. This issue arose based on Buddy's and the Officers' assertion of qualified immunity—when a defendant claims qualified immunity, the plaintiff bears the "heavy two-part burden" of showing (1) the defendant's violation of a constitutional right; and (2) that the "infringed right at issue was clearly established at the time of the allegedly unlawful activity such that a reasonable law enforcement officer would have known that his or her challenged conduct was illegal." Martinez v. Carr, 479 F.3d 1292, 1295 (10th Cir. 2007). We exercise our discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

In the present case, the district court ignored Agent Gillespie's initial intrusion into the home. Focusing on the later forced entry, the court held that the Officers' awareness of the prior violence at the home, the Officers' shared belief that a court order prohibited

11

contact between Dalcour and MCI, and the Officers' shared knowledge that both Dalcour and MCI were in the home resulted in exigent circumstances that justified the warrantless entry. Because the court determined the warrantless entry was justified, it granted Buddy and the Officers qualified immunity based on the lack of a constitutional violation.

We first note that "a police officer's mere entry or trespass into a home without consent is enough to constitute a search, often referred to in the case law as an 'unlawful entry.'" Reeves v. Churchich, 484 F.3d 1244, 1258 (10th Cir. 2007). We have held that the government bears the burden of proving that exigent circumstances justified a warrantless entry. Armijo ex rel. Armijo Sanchez v. Peterson, 601 F.3d 1065, 1070 (10th Cir. 2010). "That burden is especially heavy when the exception must justify the warrantless entry of a home." Lundstrom v. Romero, 616 F.3d 1108, 1128 (10th Cir. 2010) (citing United States v. Najar, 451 F.3d 710, 717 (10th Cir. 2006)) (quotations omitted). "[W]e use a two-part test to determine whether a warrantless search was justified by the risk of personal injury. We consider whether (1) the Officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." Najar, 451 F.3d at 718.

### 1. Agent Gillespie's Qualified Immunity on the Illegal Entry Claims

The Supreme Court has consistently held that any physical intrusion into a home constitutes entry. "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed

12

without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980). Searches requiring a

warrant share a "fundamental characteristic: the breach of the entrance to an individual's

home." Id. at 589. In Payton, the Supreme Court suggested,

> The Fourth Amendment protects the individual's privacy in a
> variety of settings. In none is the zone of privacy more
> clearly defined than when bounded by the unambiguous
> physical dimensions of an individual's home—a zone that
> finds its roots in clear and specific constitutional terms: 'The
> right of the people to be secure in their . . . houses . . . shall
> not be violated.' That language unequivocally establishes the
> proposition that at the very core of the Fourth Amendment
> stands the right of a man to retreat into his own home and
> there be free from unreasonable governmental intrusion.

Id. at 589–90 (internal citations omitted).

Other precedent from the Supreme Court also supports the view that any intrusion

into a home, no matter how slight, constitutes an entry of the home. Silverman v. United

States, 365 U.S. 505, 512 (1961) (basing its decision "upon the reality of an actual

intrusion into a constitutionally protected area," the Court held that inserting a

microphone a few inches into a home constituted an entry of the home); Kyllo v. United

States, 533 U.S. 27, 37, 40 (2001) (holding that "any physical invasion of the structure of

the home, by even a fraction of an inch, was too much" and adding that, while "[w]e have

said that the Fourth Amendment draws a firm line at the entrance to the house[, t]hat line,

we think, must be not only firm but also bright") (internal citations and quotation marks

omitted). "[T]here is certainly no exception to the warrant requirement for the officer

who barely cracks open the front door." Kyllo, 533 U.S. at 37; see also Kentucky v.

King, 131 S. Ct. 1849, 1862 (2011) ("[I]f an occupant chooses to open the door and speak

with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.").

We have also emphasized the importance of the physical limits of the home in our Fourth Amendment jurisprudence, albeit in criminal, rather than civil, cases. United States v. Hatfield, 333 F.3d 1189, 1197 (10th Cir. 2003) (observing that "[h]ad [the officer] physically invaded the curtilage to make his observation, that would have constituted a search subject to the proscriptions of the Fourth Amendment"); United States v. Maez, 872 F.2d 1444, 1450–51 (10th Cir. 1989) ("[T]he important point is that in cases of physical intrusion . . . the privacy of the home is effectively invaded.").[10] Physical entry of a home, even if only with one foot on the threshold, is an entry of the home for constitutional purposes.

Absent concerns for officer safety or other exigent circumstances, such an entry generally requires a warrant. Thus, we consider whether there were exigent circumstances which would justify Agent Gillespie's entry when she put her foot in the doorway—whether Agent Gillespie had "an objectively reasonable basis for fearing that violence was imminent." Ryburn v. Huff, 132 S. Ct. 987, 992 (2012) (per curiam).

The uncontested facts establish that Buddy told Agent Gillespie that Dalcour might be in the home, and Agent Gillespie certainly knew about the stabbing incident.

---

[10] See also United States v. Thompson, 402 F. App'x 378 (10th Cir. 2010) (unpublished); United States v. Biglow, 562 F.3d 1272 (10th Cir. 2009); United States v. Dahlman, 13 F.3d 1391, 1396 (10th Cir. 1993); United States v. Flowers, 336 F.3d 1222, 1226 (10th Cir. 2003) (all recognizing that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed").

However, when Agent Gillespie arrived at the home, she reported only hearing what she described as normal conversations between a man and a woman. Her statement is unclear as to whether she actually recognized the male voice she heard as being Dalcour's voice. As a result, for summary judgment purposes, we assume she did not recognize his voice. The remaining facts which were known to Agent Gillespie upon her entry into the home fail to establish "an objectively reasonable basis for believing that a person within the home is in need of immediate aid." Id. There was no suggestion of ongoing violence in the home, and Agent Gillespie did not know that Dalcour and the children were in the home when she put her foot in the doorway. Thus, under the facts as we have assumed them for summary judgment purposes, we conclude that she lacked the exigent circumstances necessary to justify entry into the home.[11]

To defeat a claim of qualified immunity, the Plaintiffs must show more than a constitutional violation. The Plaintiffs must also show that the "infringed right at issue was clearly established at the time of the allegedly unlawful activity such that a reasonable law enforcement officer would have known that his or her challenged conduct was illegal." Carr, 479 F.3d at 1295. Neither the Tenth Circuit nor the Supreme Court

---

[11] While placing a foot in the doorway is relatively small intrusion, the Supreme Court has emphasized the need to maintain Fourth Amendment protection for the home against even the smallest intrusions. "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure." Silverman, 365 U.S. at 512 (rejecting the argument that the physical intrusion of a spike microphone into a home is so minor as to be constitutionally insignificant) (citing Boyd v. United States, 116 U.S. 616, 635 (1886)).

15

has addressed the specific circumstances in this case, but "[w]e cannot find qualified immunity wherever we have a new fact pattern." Casey v. City of Federal Heights, 509 F.3d 1278, 1284 (10th Cir. 2007).

The Supreme Court has clearly established that Fourth Amendment protection starts at the physical limits of a home. See Hope v. Pelzer, 536 U.S. 730, 741 (2002) (warning that "officials can still be on notice that their conduct violates established law even in novel factual circumstances"). The Court has "shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." Gomes v. Wood, 451 F.3d 1122, 1134 (10th Cir. 2006) (internal quotation marks and citation omitted). "[A] general constitutional rule . . . can apply with obvious clarity to the specific conduct in question, even though [such conduct] has not previously been held unlawful." Anderson v. Blake, 469 F.3d 910, 914 (10th Cir. 2006) (internal quotation marks and alteration omitted). In sum, the qualified immunity analysis requires that we determine whether a reasonable officer would have known that the conduct at issue was unconstitutional.

In the present case, based on the extensive Supreme Court and Tenth Circuit precedent emphasizing the significance of any physical intrusion into a home, a reasonable officer should have known that placing a foot into the doorway amounted to an entry of the home for Fourth Amendment purposes. Because the facts presented do not establish an objectively reasonable basis for believing anyone in the home needed

16

immediate aid or that there was any other exigent circumstance which would justify a warrantless entry, the district court erred in granting Agent Gillespie qualified immunity.

Plaintiffs also claim that Agent Gillespie should be held liable for the later forced entry of the home under an imputed liability theory, arguing that Agent Gillespie misled Sergeant Griffith into ordering the forced entry. We have held that liability can be imputed in § 1983 actions if plaintiffs can establish "cause in fact between the conduct complained of and the constitutional deprivation." Snell v. Tunnell, 920 F.2d 673, 700 (10th Cir. 1990).

However, to survive Agent Gillespie's motion for summary judgment on qualified immunity grounds for the forced entry of the home, the Plaintiffs must present facts sufficient to show that Agent Gillespie did not miscommunicate with Sergeant Griffith through mere negligence, but rather did so intentionally or recklessly. See Daniels v. Williams, 474 U.S. 327, 331–33 (1986) (stating that "injuries inflicted by governmental negligence are not addressed by the United States Constitution"); Medina v. Cram, 252 F.3d 1124, 1132 (10th Cir. 2001) (stating that mere negligence is not sufficient to create a Fourth Amendment violation).

Here, the facts alleged do not support an inference that Agent Gillespie acted intentionally or recklessly. There is no indication in the record that Agent Gillespie was anything other than confused about the Officers' authority to enter the home, and Sergeant Griffith's mistaken impression that Dalcour had been the perpetrator of the earlier stabbing does not appear to have resulted from any intentional or reckless

17

misrepresentation by Agent Gillespie. In the absence of any facts that would suggest

Agent Gillespie acted intentionally or recklessly, we affirm the district court's grant of

qualified immunity to Agent Gillespie with respect to the forced entry of the home.

2. Sergeant Griffith's Qualified Immunity on the Illegal Entry Claims

We next consider whether Sergeant Griffith is entitled to qualified immunity for

authorizing forced entry into the home. Sergeant Griffith stands in a very different

position than Agent Gillespie with regard to the forced entry into the home. When

Sergeant Griffith arrived at the home, he learned from Agent Gillespie that there had been

a prior stabbing involving a parent and child from the home and that the parties involved

in the stabbing were in the home in violation of a no contact order. Agent Gillespie also

told him that Buddy, the person most familiar with the case and in the best position to

assess danger to the children, told law enforcement that if Dalcour was in the home,

Buddy was going to immediately remove the children. Finally, Sergeant Griffith noted

that the Plaintiffs were "out of control," based on behavior he observed after arriving at

the scene, which included the Plaintiffs striking Agent Gillespie. Aplt. App. at B-0187,

0246.

In short, Sergeant Griffith arrived at the Plaintiff's home to find an extremely

volatile situation, and he believed that Dalcour and a child were in the home in violation

of a no contact order issued because Dalcour stabbed the child.[12] This could lead a

---

[12] Sergeant Griffith erroneously believed that Dalcour was the perpetrator, not the victim, in the earlier stabbing incident. He also mistakenly believed that the no contact

(continued...)

18

reasonable officer to believe that the children were in imminent danger and that immediate entry into the home was required. Thus, we agree with the district court's holding that Plaintiffs failed to show that the forced entry violated a constitutional right. We affirm its grant of qualified immunity to Sergeant Griffith.

### 3. Buddy's Qualified Immunity on the Illegal Entry and Search Claims

Plaintiffs argue that Buddy should be held liable for the officer's alleged constitutional violations under an imputed liability theory. The Plaintiffs argue that Buddy incorrectly told Agent Gillespie that Agent Gillespie had authority to enter the home and take the children, which led her to enter the home and commit the constitutional violation. To survive Buddy's motion for summary judgment on qualified immunity grounds, the Plaintiffs must present sufficient evidence to show that Buddy miscommunicated with Agent Gillespie and did so intentionally or recklessly, not just negligently. Medina, 252 F.3d at 1132.

Plaintiffs have failed to satisfy the Medina standard. Buddy clearly conveyed the existence of the no contact order, which Agent Gillespie mistakenly believed allowed her

---

[12](...continued)
order was a valid order. Plaintiffs argue that these mistakes negates the exigent circumstances here. But Sergeant Griffith's mistakes are immaterial; "[w]e assess the propriety of Defendant's seizure 'based upon what the officers reasonably believed at that time. It does not matter that, in retrospect, information provided to the officers was wrong.'" United States v. Creighton, 639 F.3d 1281, 1288 (10th Cir. 2011) (internal citations omitted). Sergeant Griffith's belief about what was occurring appears reasonable. Plaintiffs suggest that he should have verified the information Agent Gillespie gave him, but Sergeant Griffith responds that the urgency of the ongoing confrontation precluded any in-depth review. Sergeant Griffith's beliefs, although mistaken, were not unreasonable.

to enter the home. Buddy does not appear to have directly told Agent Gillespie that she could enter the home, and even if she did, the Plaintiffs present no facts that go to her state of mind. While a fact finder might infer deliberate indifference from facts evincing that Buddy's knowledge differed from what she clearly conveyed to Agent Gillespie, such facts have not been alleged here. Buddy testified that she told Agent Gillespie about the no contact order and then told her that Buddy herself would respond to pick up the children if Dalcour was present in the home. Agent Gillespie's testimony is internally conflicting. But taken in the best light for the Plaintiffs, Agent Gillespie's responses in depositions and testimony suggest a miscommunication or misunderstanding between Buddy and Agent Gillespie, particularly given Agent Gillespie's apparent difficulty in understanding that a no contact order did not authorize her to remove the children without further action by a court.

Agent Gillespie's statements are not sufficient to support an inference that Buddy intentionally or recklessly miscommunicated to Agent Gillespie that Agent Gillespie had authority to enter the home and remove the children. In fact, Agent Gillespie does not mention anything about Buddy even suggesting that Agent Gillespie could enter the home. Thus, Plaintiffs fail to create a genuine dispute of material fact as to whether Buddy intentionally or recklessly miscommunicated so as to cause an unconstitutional entry and search. We affirm the district court's grant of qualified immunity to Buddy on

20

the illegal entry and search claims.[13]

### C. The court did not err in granting Buddy and the Officers qualified immunity on the right to familial association claim.

The Plaintiffs' familial association claim fails to specify when the alleged deprivation occurred, making the claim difficult to assess. The claim may refer to Buddy's actual removal of the children from the home, which she did pursuant to an ex parte oral court order. Such a claim would not present a constitutional violation, given that Buddy had no reason to question the validity of the oral court order and she acted on it in good faith. See Armijo, 601 F.3d at 1072 (assessing constitutionality of an action based on what the actor reasonably believed to be true at the time).

The claim may also concern the entire series of events, spanning from Buddy's request for a welfare check at the Plaintiffs' home to Avril's ultimate arrest, which led to the removal of the children. Reviewing this broader claim, the district court ruled that this claim could not survive Buddy's and the Officers' assertion of qualified immunity because the right to familial association under the circumstances in the case was not clearly established. The court did not reach the other prong of the qualified immunity analysis, whether there was an alleged constitutional violation.

Unlike the district court's approach, we will first address whether the facts as more broadly alleged give rise to a constitutional violation. We conclude they do not.

---

[13] Because we affirm the district court's grant of qualified immunity to Buddy on alternative grounds, we do not address her argument that the Officers' entry could be justified by the special needs exception to the warrant requirement. We further note the Officers do not raise this argument.

21

Assuming this claim concerns the broader series of events, the Plaintiffs do not allege a constitutional violation. Buddy requested a welfare check and told Agent Gillespie about the no contact order. Agent Gillespie mistakenly believed that the no contact order permitted her to enter the home and remove the children if Dalcour and the children were in the home, and Sergeant Griffith acted on the facts as he understood them from Agent Gillespie. That the no contact order was later deemed invalid is not relevant to our qualified immunity analysis, because no one has asserted that Buddy and the Officers did not reasonably believe the order was valid at the time. See Armijo, 601 F.3d at 1072.

Initially, Agent Gillespie went to the home to perform a welfare check. Although her illegal entry gave rise to her knowledge that Dalcour was in the home, Sergeant Griffith did not know that Agent Gillespie may have entered the home illegally when he subsequently ordered a forced entry of the home. Ultimately, a court ordered the children removed, and Buddy removed the children pursuant to the court order; no one knew at the time that Agent Gillespie may have entered the home illegally. Buddy could have more clearly conveyed to Agent Gillespie her limited authority under the no contact order, and Agent Gillespie should have more clearly described the situation to Sergeant Griffith, but even drawing all reasonable inferences from the facts presented, Buddy and Agent Gillespie were at worst negligent in depriving the Plaintiffs of their right to familial association, a level of culpability that does not support a § 1983 claim. Medina, 252 F.3d at 1132. Thus, we affirm the grant of qualified immunity based on the lack of an underlying constitutional violation.

*E. The court did not abuse its discretion in failing to instruct the jury that it should presume Avril was tased three times.*

We review the district court's spoliation sanction decision for abuse of discretion. Burlington N. & Santa Fe Ry. Co. v. Grant, 505 F.3d 1013, 1032 (10th Cir. 2007). We accept the district court's factual findings related to that decision, including a finding of bad faith or mere negligence, "unless they are clearly erroneous." Id. at 1032. "[A] district court abuses its discretion when it renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1163 (10th Cir. 2000) (citations and quotations omitted).

Plaintiffs argue that the Officers' alleged spoliation of the TASER computer record evidence should have led the district court to either instruct the jury that it should presume Avril was tased three times, or to instruct the jury that it could consider the evidence intentionally destroyed.

> [T]he general rule is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction. The adverse inference must be predicated on the bad faith of the party destroying the records. Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case.

Aramburu v. Boeing Co., 112 F.3d 1398, 1407 (10th Cir. 1997) (internal citations and quotations omitted). In Oldenkamp v. United American Insurance Co., "[t]he [plaintiffs] specifically sought an instruction to the jury that adverse inferences may be drawn from a

23

party's destruction of evidence. . . . For the [plaintiffs] to have the benefit of the type of jury instruction they requested, they must show that [the defendant] acted in bad faith." 619 F.3d 1243, 1250–51 (10th Cir. 2010) (emphasis added). Here, the Plaintiffs' suggested instructions either allowed or required the jury to draw a negative inference. Both instructions required a showing of bad faith.

The district court refused to give either jury instruction. While the district court's oral ruling was very brief, by refusing the jury instruction the district court appears to have implicitly found that any spoliation did not result from bad faith actions, a finding we review for clear error. Grant, 505 F.3d at 1032.

The record offers no indication of bad faith; at worst, it appears that the City may have been negligent, and it appears more likely that the records were lost due to a computer error. Certainly, the court's finding that there was no bad faith does not rise to the level of clear error. Absent bad faith, the Plaintiffs were not entitled to an adverse jury instruction. Regardless, the court did grant Plaintiffs a sanction by allowing them to question witnesses about the missing evidence. Under our precedent, allowing the Plaintiffs to question witnesses about missing evidence is a lesser sanction, although the Plaintiffs do not appear to recognize it as such. Henning v. Union Pac. R. Co., 530 F.3d 1206, 1220 (10th Cir. 2008) (recognizing that allowing a jury to hear about missing videotapes would be a lesser spoliation of evidence sanction). The sanction imposed by the district court is well tailored to the spoliation alleged and was not an abuse of discretion. We affirm the district court's resolution of the spoliation of evidence claim.

24

III.

We REVERSE with respect to the district court's summary judgment granting Agent Gillespie qualified immunity for her initial warrantless entry and REMAND for further proceedings on that claim alone. We AFFIRM the district court's rulings in all other respects.

Entered for the Court

Mary Beck Briscoe
Chief Judge

25