JOHN L. KANE, SENIOR U.S. DISTRICT JUDGE
On the night of February 14, 2014, Plaintiff Patti French called 911 to obtain *1020 a mental health hold for her son, Plaintiff Shane French. Officers from the Cortez Police Department arrived at the French home in short order. Hearing voices inside, they entered the residence, tackled Shane, and tased him several times. In the commotion, an officer was injured, and an officer shoved Plaintiff Glenn French, Shane's father and Patti's husband. Shane was arrested and charged with attempted murder, felony criminal mischief, felony obstruction, reckless endangerment, and menacing. He was acquitted of all charges after spending ten months in jail.
The claims brought by Patti, Glenn, and Shane French (the "Frenches") in this case arise out of the February 14, 2014 events and Shane's subsequent prosecution. Defendants are the City of Cortez, its Police Department Chief Roy C. Lane, and officers involved in the incident, Sergeant David Allmon and Officers Casey Eubanks, Jennifer Goodall,[1] and Boyd Neagle. In effect, six civil rights claims are asserted under 42 U.S.C. § 1983 : (1) the Frenches allege unlawful entry into their home by Officers Eubanks and Neagle; (2) Shane alleges excessive force by Officers Eubanks, Neagle, and Goodall;[2] (3) Glenn alleges excessive force by Officers Eubanks and Neagle; (4) Shane alleges false arrest and unlawful seizure of his person by Sergeant Allmon and Officers Eubanks, Neagle, and Goodall; (5) Shane alleges malicious prosecution by Officers Eubanks, Neagle, and Goodall; and (6) the Frenches allege that the City of Cortez failed to adequately train its officers in the recognition of and interaction with persons with mental illness.[3] Glenn and Shane additionally allege that Officer Eubanks denied them the benefits reserved to them by the Americans with Disabilities Act ("ADA"). Defendants now move for summary judgment on each of these claims.
The Frenches submit that "this is a classic example of law enforcement, as a result of inadequate training, criminalizing and incarcerating mentally ill people." Resp. at 1. The facts, as presented by the Frenches, support that charge. The officers involved unreasonably acted based on previously held assumptions and information without reacting to the circumstances as they unfolded. Still, some of the Frenches' claims cannot overcome the defense of qualified immunity or are legally deficient. For the reasons that follow, I grant Defendants' Motion for Summary Judgment in part and deny it in part.
I. Legal Standard
Summary judgment is only appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the *1021 outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). And a factual dispute is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." Id. If there are no genuine disputes regarding material facts and the nonmoving party fails to make a sufficient showing on an essential element of his case for which he bears the burden of proof at trial, then the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The judge's function at the summary judgment stage "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby , 477 U.S. at 249, 106 S.Ct. 2505.
For summary judgment purposes, I must view the evidence in the light most favorable to the nonmoving party and resolve all disputed facts in favor of that party. McCoy v. Meyers , 887 F.3d 1034, 1044 (10th Cir. 2018). Accordingly, the facts are recounted here resolving all disputes in favor of the Frenches.
II. Facts-Viewed in the Light Most Favorable to the Frenches
Shane French has struggled with mental health problems, like post-traumatic stress disorder (PTSD) and bipolar disorder, for years.[4] In the past, when Shane was down or not thinking clearly, Patti usually just let him talk until he wore himself out so that he wouldn't drive or leave their home. Patti Dep. at 46:16-47:10, ECF No. 49-1. On a few occasions, however, Patti and Glenn French sought assistance from the Cortez Police Department. Id. at 47:20-48:9, 66:24-67:1; Glenn Dep. at 14:19-15:3, ECF No. 49-2. The responding officers generally were successful in calming Shane down just by talking to him or offering to give him a ride somewhere.
Shane had many other less congenial interactions with the Police Department over the years, though, including instances in which he injured family members and engaged in criminal activity. Shane's criminal history, for example, includes arrests in 2000 for resisting arrest and in 2011 for misdemeanor assault of a police officer. Patti Dep. at 148:2-24, 151:3-6.[5] In September 2003, the police were called by a neighbor after Shane accidentally poked his father with a barbecue fork while climbing through a window. Id. at 109:19-110:1, 133:9-15; Glenn Dep. 35:16-36:22. Almost ten years later, Shane hit his brother while they were wrestling, and his brother decided to press charges so that Shane could receive help. Patti Dep. at 110:2-111:15.
The Cortez Police Department was impacted by its interactions with Shane to the extent that Chief Lane admitted, when Shane was involved in a call, it was not one the Department liked to take. Lane Dep. at 39:10-14, ECF No. 55-20. Prior to February 14, 2014, a number of the Department's officers, including Officer Goodall and Sergeant Allmon, had been dispatched to the French residence due to Shane's *1022 conduct. Goodall Aff. at 2, ECF No. 49-6; Allmon Aff. at 2, ECF No. 49-7. Likewise, Officer Neagle had interacted with Shane and had knowledge that he carried knives in the sleeves of his leather jacket. Neagle Dep. at 7:17-9:13, 11:13-14, ECF No. 49-3; accord Patti Dep. at 154:20-155:8 (admitting that, starting in 2013, it was typical for officers to find knives on Shane or in his vehicle when coming into contact with him). The prevailing attitude within the Department in responding to incidents involving Shane was that he must be "high" or "off his meds." Lane Dep. at 36:22-37:1.
In Colorado in 2014, an individual could be placed under a 72-hour emergency mental health hold for treatment and evaluation if he appeared to have a mental illness and, as a result of that illness, appeared to be "an imminent danger to others or to himself" or to be "gravely disabled." Colo. Rev. Stat. § 27-65-105(1). Initiating the process for such a hold could be done either: (1) by a certified peace officer, medical professional, licensed professional counselor, or clinical social worker, among others, or (2) via an affidavit sworn to or affirmed before a judge. Id.
On the night of February 14, 2014, Patti French called 911 for the Cortez Police Department to initiate that process. Shane was in trauma after he stopped taking his psychiatric medications. Patti Dep. at 67:19-21, 112:14-16, 132:4-7. Patti and Glenn had attempted to calm him but ultimately decided they needed the police to intervene. Shane had been rambling nonsensically and yelling at the top of his lungs outside the house for hours, and Patti didn't want to disturb the neighborhood. Id. at 64:16-65-16. She called 911 and calmly informed dispatch that Shane was "out of control" and she believed he needed a mental health hold. 911 Call at 00:18-20, 00:45-46, ECF No. 55-1. Patti specifically requested that any officers arrive with their lights and sirens turned off because she believed they would upset Shane further. Id. at 00:33-40.
Cortez Police Dispatch radioed the call and relayed that the officers should not arrive with their emergency lights or sirens activated. Neagle Aff. at 2, ECF No. 49-5. Because Shane was involved and the call came from Patti and late at night, Sergeant Allmon coded it a "10-0," indicating to the officers that they should use additional caution when responding. Allmon Aff. at 2. Dispatch contacted and questioned Patti again, and she confirmed that Shane's acting out was entirely verbal, he was not violent, and he needed "mental help." 911 Call at 03:28-36.
Upon arriving at the French home, Officers Eubanks and Neagle observed Shane at the entrance to the residence. Eubanks Aff. at 2, ECF No. 49-4; Neagle Aff. at 2. As they approached, Shane went inside and shut the door. Id. The officers then heard voices, including a man talking very loudly, inside the home. Patti Dep. at 181:19-182:1. Officer Eubanks engaged the door handle and found it to be locked. He began to bang loudly on the door. As Patti and Glenn moved toward the door, Shane was in Patti's line of sight with his hands empty. Id. at 81:2-25. Patti reached the door and unlocked it, but before either Glenn or Patti could open it, the officers burst through. Id. at 77:13-78-16. The door flung open with such force that it left a hole in the wall and broke the frame. Door Photos. at 1, 3, ECF No. 55-10; French , No. 2014-CR-000040, 12/04/2014 Trans. at 38:19-39:1, ECF No. 55-15. Patti jumped out of the way, and Glenn was shoved by Officer Eubanks.[6] Patti Dep. at 78:16-18; Glenn Dep. at 15:21-25. The officers were *1023 yelling and told Glenn to get out of the way. Id. at 18:2-3; Patti Dep. at 82:16-25. Officer Ryan Carter, who is no longer a defendant in this case, entered the home behind the other officers. Together they moved directly toward Shane without giving him any verbal warnings. Id. at 82:4-13. Shane took at most a step or so in the direction of the kitchen where the officers were headed. Id. at 82:6-11. Shane did not lunge at Officer Eubanks, French , No. 2014-CR-000040, 04/30/2014 Trans. at 58:15, and his hands were at his sides empty, French , No. 2014-CR-000040, 10/17/2014 Trans. at 46:4-13, ECF No. 55-5. Officer Eubanks rushed towards Shane, made chest-to-chest contact with him, picked him up off the ground, and threw him down so that he fell face-down on the floor. Officer Eubanks' body camera was inadvertently activated during this skirmish.
While on top of Shane, Officer Eubanks saw a knife in each of Shane's hands.[7] Eubanks Aff. at 4; Eubanks Dep. at 99:21-100:1, ECF No. 49-8. Officer Carter removed the two knives and placed them behind him out of reach. Carter Dep. at 16:25-17:10, ECF No. 49-11. To assist Officer Eubanks, Officer Neagle drew his Taser and delivered a drive stun[8] with the Taser to Shane's lower back on the right side at least two times. Taser Log at 6, ECF No. 55-13. Shane was yelling "just kill me" as he was restrained. Body Camera Video at 00:13, ECF No. 49-15.
Officers Eubanks, Neagle, and Carter along with Sergeant Allmon, who had also entered the home, placed Shane in handcuffs. The two knives-a paring knife and a steak knife-were laying on the floor. Neagle Aff. at 4; Goodall Aff. at 3; Patti Dep. at 166:9-24. Meanwhile, Officer Eubanks felt a burning or stinging on his lower right side and confirmed that he had a ½ mm cut.
Sergeant Allmon and Officer Neagle removed Shane to the front yard, shutting the front door of the Frenches' home. Patti Dep. at 94:13-20. They began a pat-down search of Shane at Officer Neagle's patrol vehicle. At least five officers surrounded and restrained Shane, pressing his cuffed hands up over his shoulders. As a compliance technique, Sergeant Allmon struck the area of Shane's suprascapular nerve. Allmon Aff. at 4. Officer Neagle administered approximately five drive stuns with his Taser to Shane's back within two minutes and thirty-six seconds. Neagle Aff. at 5; Taser Log at 6, ECF No. 55-13. And Officer Jennifer Goodall, who also appeared at the scene, administered a compression wrist lock to Shane. Goodall Aff. at 3. Officer Eubanks' body camera video shows Shane moving and the officers using force against him. Ultimately, a hobble restraint device was secured on Shane's ankles. Neagle Aff. at 5; Allmon Aff. at 4.
While he was restrained against the vehicle, Shane apologized to the officers no *1024 fewer than ten times and explained that he believed they were trying to hurt his family, specifically his blind father. Body Camera Video at 06:41-09:42. He also informed the officers that he had "mental problems." In response, individual officers called him a "stupid fuck" and told him to "shut up." Id. at 08:06-08:51. Stepping away, Officer Eubanks, muttered, "I should have fucking shot that son of a bitch," Body Camera Video at 09:56-58, and at some point struck a patrol car with his knee. Eubanks Dep. at 29:16-25, ECF No. 55-8.
The assessment and pat-down of Shane outside was completed in a little over six minutes, and he was placed into Officer Neagle's vehicle. From the time of Patti's 911 call to the time the officers radioed that Shane was in custody, approximately 15 minutes elapsed. Shane was taken to the hospital, where the numerous burn marks on his back from the drive stuns did not prevent him from being medically cleared. Goodall Aff. at 4; Shane Photos. at 1-3, ECF No. 55-9. The officers then transported him to the jail and did not seek any type of mental health treatment for him.[9]
*1025 Based on the statements of the other officers involved in the February 14, 2014 incident and what she witnessed, Officer Goodall selected the criminal offenses with which Shane was initially charged. They included attempted murder, felony criminal mischief, attempting to disarm a police officer, felony obstruction, reckless endangerment, and menacing. Goodall Aff. at 4-5. The District Attorney's Office filed and prosecuted those criminal charges against Shane, who spent approximately ten months in custody as a result. See Furse Aff., ECF No. 49-12. Shane took the case to trial, and a jury acquitted him of all charges.
The individual Defendants in this case had all undergone training on the Cortez Police Department's Use-of-Force Policy, which directs officers to take into account a "subject's mental state or capacity" in determining the reasonableness of force. Cortez Police Dep't Policy Manual at 37, ECF No. 49-14. The Department provides annual training on that Policy, and its Field Training Program and Daily Training Bulletins update officers regarding the appropriate use of force. Lane Aff. at 2, ECF No. 49-13. Each of the Department's officers are also sent to the Colorado Peace Officer Standards and Training Crisis Intervention Training, which includes training on how to identify and interact with persons with mental illnesses. Id. at 3. Nonetheless, Officer Eubanks testified that he has no training in identifying mental health disorders or in how to interact with individuals with bipolar disorder, PTSD, or schizophrenia. Eubanks Dep. at 103:20-104:10, 114:6-115:1, ECF No. 55-8.
III. Analysis
The purpose of motions for summary judgment is to demonstrate there is no need for a trial because under the undisputed facts, or based on the facts presented by the nonmovants, the law dictates a judgment in the movants' favor. As noted in the previous Section, however, Defendant-Movants dispute and recharacterize the factual record put forward by the Frenches. Viewing the facts in the light most favorable to the Frenches, as I must, I conclude that summary judgment is not proper for the Frenches' unlawful entry claim, Shane's excessive force and false arrest claims, or the Frenches' claim against the City of Cortez for failure to train its officers. It is, however, appropriate on the remaining claims.
A. Qualified Immunity for 42 U.S.C. § 1983 Claims Brought Against Officers Individually
The majority of the claims asserted in this case are brought under 42 U.S.C. § 1983, which creates a private cause of action to vindicate violations of "rights, privileges, or immunities secured by the Constitution and laws" committed by any person acting under color of state law. For each of the § 1983 claims the Frenches assert against Defendant Officers in their individual capacities, the officers raise the defense of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Pearson v. Callahan , 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting Harlow v. Fitzgerald , 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties *1026 reasonably." Pearson , 555 U.S. at 231, 129 S.Ct. 808. "Put simply, [it] protects 'all but the plainly incompetent or those who knowingly violate the law.' " Mullenix v. Luna , --- U.S. ----, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (quoting Malley v. Briggs , 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) ).
"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." Martinez v. Beggs , 563 F.3d 1082, 1088 (10th Cir. 2009) (citing Pearson , 555 U.S. at 232, 129 S.Ct. 808 ). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Morris v. Noe , 672 F.3d 1185, 1196 (10th Cir. 2012) (internal quotation marks and citation omitted). "[T]he clearly established law must be 'particularized' to the facts of the case," White v. Pauly , --- U.S. ----, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (quoting Anderson v. Creighton , 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ), and "should not be defined 'at a high level of generality,' " White , 137 S.Ct. at 552 (quoting Ashcroft v. al-Kidd , 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) ). A prior case need not, however, have "identical" facts. Patel v. Hall , 849 F.3d 970, 980 (10th Cir. 2017) (citation omitted). The overarching question is whether the "clearly established right is one that is 'sufficiently clear that every reasonable official would have understood what he is doing violates that right.' " Mullenix , 136 S.Ct. at 308 (quoting Reichle v. Howards , 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012) ).
I proceed by analyzing the Frenches' § 1983 claims more or less in the order in time in which they arose, beginning with the alleged unlawful entry of Officers Eubanks and Neagle into the French home.
1. The Frenches' Unlawful Entry Claim Against Officers Eubanks and Neagle
The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Amendment imposes two requirements: "First, all searches and seizures must be reasonable. Second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." Kentucky v. King , 563 U.S. 452, 459, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011).
A basic principle of the Fourth Amendment is that "searches and seizures inside a home without a warrant are presumptively unreasonable." Brigham City, Utah v. Stuart , 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (internal quotation marks omitted). At the very core of the Amendment, " 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " Payton v. New York , 445 U.S. 573, 589-90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (quoting Silverman v. United States , 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961) ).
One exception to the requirements of a warrant and probable cause " 'is a search that is conducted pursuant to consent.' " United States v. Sawyer , 441 F.3d 890, 894 (10th Cir. 2006) (quoting Schneckloth v. Bustamonte , 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ). Another is when " 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the *1027 Fourth Amendment." Mincey v. Arizona , 437 U.S. 385, 393-94, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (citing McDonald v. United States , 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948) ; Johnson v. United States , 333 U.S. 10, 14-15, 68 S.Ct. 367, 92 L.Ed. 436 (1948) ).
Officers Eubanks and Neagle contend that their entry into the French home did not violate the Frenches' Fourth Amendment rights because Patti gave them consent to enter, and even if she did not, exigent circumstances justified their entry. Crediting the officers' arguments, the Colorado state court judge who presided over Shane's criminal case found that exigent circumstances existed and that Patti consented to the officers' entry by calling 911 for help and opening her front door slightly. Colorado v. French , No. 2014-CR-000040, 10/17/2014 Trans. at 258:17-261:9, ECF No. 49-10. Perhaps the record before that judge supported his conclusion, but the record before me is distinct, and I am bound to construe the facts in the light most favorable to the Frenches.
Consent
Considering that factual background, neither Patti nor any member of the French household consented to Officers Eubanks and Neagle entering the home. "When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do." King , 563 U.S. at 469, 131 S.Ct. 1849. Thus, when an officer knocks on a door and requests to speak with an occupant, that individual "has no obligation to open the door or to speak." Id. at 469-70, 131 S.Ct. 1849. "And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." Id. at 470, 131 S.Ct. 1849. Consent obviating the need for a warrant and probable cause is valid only if it is " 'freely and voluntarily given.' " Sawyer , 441 F.3d at 894 (quoting Schneckloth , 412 U.S. at 222, 93 S.Ct. 2041 ).
Viewing the facts emphasized by Officers Eubanks and Neagle in the light most favorable to the Frenches, Patti called for emergency assistance late at night stating that her son was "out of control." She went to her front door as the officers were knocking on it. She unlocked the door, but did not open it. Together, these actions do not demonstrate that Patti consented, either expressly or impliedly, to having officers barge into her home.[10] Officers Eubanks and Neagle base their argument that Patti consented primarily on the fact that she testified she intended to open the door and allow them to enter. However, since consent must be "freely and voluntarily given ," Sawyer , 441 F.3d at 894 (emphasis added), Patti's intentions that never materialized are irrelevant.
The cases cited by Officers Eubanks and Neagle focus on whether "the consent was *1028 the product of an 'essentially free and unconstrained choice by [the] maker' or whether it was the product of 'duress or coercion, express or implied.' " Sawyer , 441 F.3d at 895 (quoting Schneckloth, 412 U.S. at 225, 227, 93 S.Ct. 2041 ). That question is impossible to reach here because no choice was ever made. Before Patti had the opportunity to choose, the officers were in her living room. The only choices she made were to call 911 to seek mental health assistance for her son and to walk towards her front door. Simply calling 911 for purposes other than reporting a crime cannot be construed as boundless consent for officers to disregard evolving circumstances and enter a home in any manner without attempting to question the caller or occupants.[11] Setting such a low threshold for consent would eviscerate the protection against unreasonable governmental intrusion provided by the Fourth Amendment.
With their ill-considered consent theory, Officers Eubanks and Neagle highlight the qualified immunity standard's potential for abuse. They comment that "Plaintiffs cannot identify Supreme Court or Tenth Circuit case law which would show that, on February 14, 2014, officers['] entry into a home when they responded to a call for assistance ... and a resident of the home intentionally unlocked ... the door, intending to permit officers to enter, would constitute a violation of law." Mot. at 32. It is true; the Frenches have not cited a case on point. This is likely because factually similar cases are rightly presented and analyzed under the exigent circumstances standard. See, e.g. , Thacker v. City of Columbus , 328 F.3d 244, 254-55 (6th Cir. 2003) (stating that a call from an occupant of the home soliciting a response from an emergency team does not amount to consent and examining whether exigent circumstances existed). Based on the clearly established law, Officers Eubanks and Neagle, like every reasonable official, should have known that they lacked consent to enter the Frenches' home.
Exigent Circumstances
The officers' argument that exigent circumstances existed, authorizing their entry and entitling them to qualified immunity, is likewise deficient. One exigency, acting as an exception to the Fourth Amendment warrant requirement, "is the need to assist persons who are seriously injured or threatened with such injury." Brigham City , 547 U.S. at 403, 126 S.Ct. 1943. "Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Id. (citing Mincey , 437 U.S. at 392, 98 S.Ct. 2408 ).
In determining whether such circumstances justified an officer's entry, courts must assess: "(1) whether the officer had an objectively reasonable basis to believe there was an immediate need to protect the lives or safety of himself or others; and (2) whether the manner and scope of the search or seizure was reasonable." Lundstrom v. Romero , 616 F.3d 1108, 1124 (10th Cir. 2010). "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's *1029 state of mind, 'as long as the circumstances viewed objectively , justify [the] action.' " Brigham City , 547 U.S. at 404, 126 S.Ct. 1943 (quoting Scott v. United States , 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) ). "The officer's subjective motivation is irrelevant." Brigham City , 547 U.S. at 404, 126 S.Ct. 1943.
"The burden is on the government to demonstrate the existence of exigent circumstances." Mascorro v. Billings , 656 F.3d 1198, 1205 (10th Cir. 2011) (citing Welsh v. Wisconsin , 466 U.S. 740, 749, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) ).[12] " 'That burden is especially heavy when the exception must justify the warrantless entry of a home.' " Lundstrom , 616 F.3d at 1124 (10th Cir. 2010) (quoting United States v. Najar , 451 F.3d 710, 717 (10th Cir. 2006) ).
Officers Eubanks and Neagle base their reasoning that exigent circumstances existed on the following:
• Patti had telephoned 911 stating that her son was "out of control";
• Shane had prior interactions with law enforcement and the officers were generally aware of his demeanor and history;
• Shane was known to carry knives on his person;
• The officers were instructed to use additional caution in responding to Patti's call;
• When the officers arrived, they saw Shane walk inside the home and shut the door;
• The officers then heard voices, including a man talking very loudly, inside the home; and
• The officers found the front door locked and then unlocked.[13]
Significant, though, are the circumstances the officers did not encounter:
• The officers had not been told that a crime, completed or in-progress, had been reported;
• The noises coming from inside the house were not suggestive of an altercation taking place within the home or of someone being injured; and
• When the officers saw Shane at the entrance to the home, there was no indication that he had weapons or had injured Patti or Glenn.
With these conditions absent, a jury could conclude that the officers did not have an objectively reasonable basis to believe anyone inside the home was in need of immediate aid at that moment in time.
The facts of Brigham City, Utah v. Stuart shed light on officer observations that support the reasonableness of entering to aid someone in need. Officers in that case were called to respond to a loud party at a residence at 3 o'clock in the morning. 547 U.S. at 406, 126 S.Ct. 1943. "As they approached the house, they could hear *1030 from within an altercation occurring, some kind of fight." Id. (internal quotation marks and citation omitted). They "heard 'thumping and crashing' and people yelling 'stop, stop' and 'get off me.' " Id. (citation omitted). Based on these details, the Supreme Court held that the officers had a reasonable basis for believing someone was in need of help and that nothing in the Fourth Amendment required them to wait until the violence escalated. Id.
Here, on the other hand, there was no thumping or crashing or yelling "stop" or any other alarming cry. None of the specific facts recited by the officers would lead one to believe that an altercation or fight was occurring inside the French home. Instead, the officers witnessed Shane retreat into his own home, which he was entitled to do. See Payton , 445 U.S. at 589-90, 100 S.Ct. 1371 (quoting Silverman , 365 U.S. at 511, 81 S.Ct. 679 ). They then heard voices. But unlike in Brigham City , they did not decipher what was being said or why. Without some informed hypothesis of what was happening in the home, the officers did not have an objectively reasonable basis to enter.[14]
As for the reasonableness of the manner and scope of the search by Officers Eubanks and Neagle, Brigham City again provides a foil. The officers in Brigham City first looked in the front window for clues as to the source of the noises they heard. 547 U.S. at 406, 126 S.Ct. 1943. After seeing nothing, they proceeded around to the backyard to investigate further. Id. There, they encountered two juveniles drinking beer and could see a physical fight occurring in the kitchen. Id. At that point, the leading officer opened the back screen door, yelled in "police," and entered only after no participant in the skirmish gave notice. Id. Even then, the officer announced himself once more after entering, avoiding the need to go hands on. Id. The Supreme Court held such a manner of entry was reasonable. Id.
In contrast, the officers here banged on the front door and burst through it before it could be answered.[15] There is no indication they attempted to investigate (or even stopped to listen to) the noises they heard. If, as the officers allege, they were justified in entering based on their concern for the safety of Patti and Glenn, their initial search should have been limited to assuring Patti and Glenn were not in need of immediate assistance. Yet, in their Reply in support of their Motion for Summary Judgment, Defendants assert that the scope of the officers' search was "limited to immediately contacting and arresting Shane in the front room of the home, and then removing him from the home." Reply at 23, ECF No. 61. Contacting Shane, who was not reported to have committed any crime, should not have been the target of any search based on protecting Patti and Glenn. Moreover, once the front door to the home was opened, the officers were able to see that Patti and Glenn were not in need of immediate aid. But rather than reacting to this discovery or rendering any assistance, an officer shoved Glenn, one of the believed victims.
*1031 Consequently, under the facts presented by the Frenches, the officers did not have an objectively reasonable basis to believe there was an immediate need to protect the lives and safety of those inside the home and the scope of their search was unreasonable.
I turn then to whether, based on the clearly established law at the time, the officers should have known they were violating the Frenches' Fourth Amendment Rights. The Frenches point to an unpublished Tenth Circuit case: Dalcour v. City of Lakewood , 492 F. App'x 924 (10th Cir. 2012) (unpublished). There, a panel of the Court of Appeals held that, under similar circumstances, the law was clearly established that warrantless entry was unlawful. Id. at 934. A stabbing had previously taken place at the residence and the state court had ordered the husband to avoid the family home and have no contact with the minor children. Id. at 927. Believing the husband was not obeying the court order, a caseworker requested that officers perform a welfare check to determine if the husband was in the home. Id. Before knocking on the door of the residence, the responding officer heard an adult male voice inside. Id. at 927-28. The officer knocked and the wife opened the door just enough to talk. Id. at 928. The wife refused to answer questions about her husband or to allow the officers to enter her home. Id. The officer reacted by placing her foot in the doorway so that the wife could not shut the door. Id. Doing so, the court held, amounted to an entry for Fourth Amendment purposes and was not objectively reasonable since exigent circumstances were lacking. Id. at 934. Citing "the extensive Supreme Court and Tenth Circuit precedent emphasizing the significance of any physical intrusion into a home," the court concluded the district court had erred in granting the officer qualified immunity. Id.[16]
In evaluating whether the law was clearly established, I consider United States v. Davis , 290 F.3d 1239, 1240 (10th Cir. 2002), as well. The police in that case were called to respond to a report of a possible domestic disturbance shortly before 5:30 a.m. After the first officer arrived, the front door opened and the defendant stood in the doorway with alcohol on his breath and bloodshot eyes. Id. In response to the officer's questions, he stated that he had been disciplining his child and that his wife was out of town. Id. at 1241. The defendant's wife appeared at the door at that moment and was observed resisting the defendant's efforts to close the door. Id. When the officers requested to enter the home, the defendant refused and retreated inward. Id. The officers entered the house after him, purportedly out of concern for their safety and welfare. Id. The Tenth Circuit upheld the district court's ruling that exigent circumstances did not justify the officers' warrantless search of the defendant's home. Id. at 1244. It noted that, although the defendant had obviously been untruthful regarding the presence of his wife, he had not displayed a threatening or aggressive manner towards the officers. Id. at 1243. It found the district court's conclusion that the officers could have checked the defendant's wife's condition without entering the home to be logical. Id. Furthermore, the court cautioned that "granting unfettered permission to officers to enter homes, based only upon a general *1032 assumption domestic calls are always dangerous, would violate the Fourth Amendment." Id. at 1244.
While the facts of these cases are not identical to those here, they need not be. See Patel , 849 F.3d at 980. They provide a clear picture of what a reasonable officer should have known the law to be. In both Dalcour and Davis , officers believed a dangerous person to be present inside the home but lacked signs of physical aggression. As the officers in those cases were found to have violated the occupants' Fourth Amendment rights, the officers here should have understood their actions were unlawful.
In sum, the Frenches have met their burden to show that Officers Eubanks and Neagle violated their Fourth Amendment rights to be free from unreasonable search in their home and that the relevant contours of that right were clearly established on February 14, 2014. Neither consent nor exigent circumstances justified the officers' entry. It follows that Officers Eubanks and Neagle are not entitled to summary judgment on the Frenches' unlawful entry claim on the basis of qualified immunity. This conclusion does not "unduly inhibit officials in the discharge of their duties," Creighton , 483 U.S. at 638, 107 S.Ct. 3034 (citation omitted), it merely discourages the plainly incompetent and those who knowingly violate the law, Mullenix v. Luna , --- U.S. ----, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015). Specifically, it confirms that, under these circumstances, officers cannot rush into a residence in order to deprive the occupant of the opportunity to refuse entry and to avoid discovering critical information.
2. Shane's Excessive Force Claim Against Officers Eubanks, Neagle, and Goodall
In addition to protecting individuals against unreasonable searches, the Fourth Amendment prohibits law enforcement from using force that is not objectively reasonable during a seizure. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham v. Connor , 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (quoting Tennessee v. Garner , 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ). Proper application of the reasonableness test under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham , 490 U.S. at 396, 109 S.Ct. 1865. The reasonableness of an officer's use of force "must be judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight." Id. This perspective is imperative since "police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." Id. at 396-97, 109 S.Ct. 1865.
Shane alleges that the uses of force against him by Officers Eubanks, Neagle, and Goodall were unreasonable considering the totality of the circumstances. He also claims that Officers Eubanks and Goodall acted unreasonably by not intervening in Officer Neagle's use of force.
Officer Eubanks
Officer Eubanks tackled Shane to the ground and restrained him face down with *1033 his body weight until he was cuffed. Officer Eubanks justifies his use of force by stating that Shane ran towards, but did not lunge at, him. As explained above, I must view the facts in the light most favorable to Shane and have found, for the purposes of summary judgment, that Shane took at most a step or so in the direction the officers were headed.
At the time Officer Eubanks decided to go "hands on" with Shane, no crime had been committed.[17] When the officers first encountered him, he did not make any aggressive movements toward them, and in fact, he closed his front door to avoid them. Shane was confined in his home and the officers point to no signs that he was attempting to flee. Shane took at most a step or so in the direction the officers were headed after they forced their way in. There were no weapons visible in Shane's hands, he did not lunge at or threaten the officers, and there was no indication Patti and Glenn were injured or in danger. The officers gave him no warnings as to what he should do or explanations as to why they were there.
The reasonableness of Officer Eubanks' actions depends both on whether he was "in danger at the precise moment that [he] used force and on whether [his] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." Sevier v. City of Lawrence , 60 F.3d 695, 699 (10th Cir. 1995). To the extent that any force was needed, the officers' decision to forcibly enter and apprehend Shane and Officer Eubanks' decision to tackle him, rather than employing other means, were certainly principal causes. See Asten v. City of Boulder , 652 F.Supp.2d 1188, 1204 (D. Colo. 2009) (reaching the same conclusion with respect to an officer who tased a disoriented woman through her locked screen door when the woman had committed no crime, did not pose a threat to anyone, and had not been given any warning). Furthermore, "[i]t is not objectively reasonable to ignore specific facts as they develop (which contradict the need for this amount of force)," namely that Shane was not a danger to Glenn and Patti or the officers, "in favor of prior general information about a suspect." Cavanaugh v. Woods Cross City , 625 F.3d 661, 666 (10th Cir. 2010). Based on these facts, Shane has met his summary judgment burden of demonstrating that Officer Eubanks violated his Fourth Amendment rights by throwing him to the ground and restraining him face down with his body weight.
From at least one Tenth Circuit case, any reasonable officer should have understood that such a use of force was excessive. In Casey v. City of Federal Heights , 509 F.3d 1278, 1282 (10th Cir. 2007), a panel of the Tenth Circuit criticized the defendant-officer for "grabb[ing] and then tackl[ing] [the plaintiff Edward Casey] without ever telling him that he was under arrest" and for not "giv[ing] Mr. Casey a chance to submit peacefully to an arrest." Mr. Casey had left the courthouse after a traffic hearing with his court file, which may have been a misdemeanor. Id. at 1279-80. As he was walking back to the courthouse from the parking lot with the file, he was stopped by an officer who told him to return to his truck. Id. at 1280. Mr. Casey explained that he needed to give back the file and moved around the officer. Id. That triggered a series of events beginning with the officer grabbing Mr. Casey *1034 and jumping on his back and leading to other officers tasing and beating him. Id. Upon examination of the facts, the court announced that "a reasonable officer should, at a minimum, have ordered Mr. Casey to submit to an arrest or used minimal force to grab him while informing him that he was under arrest." Id. at 1282. It blamed the officer's use of force for transforming Mr. Casey's arrest from a routine encounter. Id. at 1283. Although the facts in Casey are not identical in that the plaintiff there was suspected of committing a crime, he was not in his home, he stepped around the officer, and he was not noted to have any history with the police, the court's directives were unequivocal and should have been instructive for the present circumstances.[18]
That being the case, Officer Eubanks is not entitled to summary judgment on the basis of qualified immunity for Shane's excessive force claim.
Officer Neagle
After Officer Eubanks' initial takedown of Shane, while he was restraining Shane in the prone position, he saw a knife in each of Shane's hands. Officer Carter promptly removed the two knives from Shane's hands. Seeking to assist Officer Eubanks, Officer Neagle drew his Taser and delivered a drive stun with the Taser to Shane's lower back on the right side at least two times. Officer Neagle asserts those two drive stuns were justified, regardless of whether it was known Shane was in possession of knives or that Officer Eubanks had been injured, since Shane was resisting and presented a threat to Officer Eubanks.
Once Shane was cuffed and taken outside, Officer Neagle employed his Taser to drive stun Shane at least five times as the officers were completing the pat-down. Officer Neagle argues his use of force during that period was reasonable because Shane was still resisting, had not yet been cleared for weapons after having injured Officer Eubanks, and attempted to take his Taser from him.
Viewing the facts in the light most favorable to Shane, Officer Neagle's use of force both inside and outside the French home rose to the level of a constitutional violation. Inside the home, Shane was tackled after taking at most a step or so, but not lunging, in the direction the officers were headed. When Officer Neagle deployed his Taser, Officer Eubanks was on top of Shane and had him positioned face down beneath him. Officer Eubanks had already demonstrated that he could physically dominate Shane by picking him up and turning him as he threw him to the ground. More than that, at least three officers were surrounding Shane and assisting to control his limbs. Once Officer Carter removed the knives from Shane's hands, the immediate threat Shane posed to the officers was minimal.
The evidence is conflicting on the extent to which Shane resisted arrest. Shane did not initiate the physical struggle with the officers. Officer Eubanks' body camera video documents Shane yelling "just kill me," not commonly the words of a combative individual. There is no indication or testimony that Shane fought Officer Carter's removal of the knives from his possession. Making all inferences in Shane's favor, his resistance could have been a less than voluntary reaction to being thrown to the ground and tased. Shane's defiance in such a fashion "does not retroactively justify"
*1035 the uses of force. Dixon v. Richer , 922 F.2d 1456, 1463 (10th Cir. 1991). Shane's actions must also be considered in light of the fact that he was not informed why he was being arrested, nor was he given any warnings regarding use of the Taser. The Tenth Circuit recently emphasized the significance of giving a warning regarding the imminent use of force, distinguishing Cavanaugh v. Woods Cross City , in which a woman was tased in the back without warning, from Aldaba v. Pickens , 844 F.3d 870, 876 (10th Cir. 2016), in which several warnings were given before deployment of the Taser. Lee , 904 F.3d at 1150 n.1.
Outside the French home, it was known to Officer Neagle that Officer Eubanks had been injured, likely due to the knives in Shane's possession. But Shane was surrounded by at least five officers and handcuffed with his hands being forced up toward his shoulders. At that point, he certainly did not pose an immediate threat to the officers. "While it is reasonable to frisk a detainee suspected of carrying a weapon, ... it is not reasonable to hit him in the stomach with a flashlight, or choke and beat him, solely on the basis of that suspicion." Dixon , 922 F.2d at 1463 (citation omitted). As to the extent Shane resisted arrest while being patted down, it is unclear for that period as well. Officer Eubanks' body camera video shows Shane moving and the officers using force against him. Shane can also be heard confessing that he has "mental problems" and apologizing to the officers repeatedly, again not an intuitive utterance by someone resisting arrest. Still, he was provided with no explanation, and there were no commands given to him other than to "stop resisting." Faced with this situation, Officer Neagle drive stunned Shane five more times within two minutes and thirty-six seconds. Each time Officer Neagle tased Shane, the more excessive and at the same time the less necessary the use of force became. See Perea v. Baca , 817 F.3d 1198, 1203 (10th Cir. 2016) ("Although use of some force against a resisting arrestee may be justified, continued and increased use of force against a subdued detainee is not."); Cyrus v. Town of Mukwonago , 624 F.3d 856, 863 (7th Cir. 2010) ("Force is reasonable only when exercised in proportion to the threat posed ..., and as the threat changes, so too should the degree of force. Force also becomes increasingly severe the more often it is used; striking a resisting suspect once is not the same as striking him ten times." (citations omitted) ).
The circumstances as portrayed by Shane are similar to those in Perea v. Baca , in which a man who suffered from mental illness was accosted by officers while riding his bicycle. 817 F.3d at 1201. The man's mother had reported that her son was on drugs and she was concerned for his welfare. Id. After coming across the man and witnessing him violate traffic laws, officers pushed him off of his bicycle. Id. In the scuffle that ensued, the man thrashed and waved a crucifix at the officers causing them to tase him ten times until he eventually stopped breathing. Id. The Tenth Circuit panel affirmed the district court's ruling that it was unreasonable to tase the man repeatedly after he had been removed from his mode of transportation. Id. at 1204. Weighing the nonexclusive factors articulated in Graham , the court stressed that the man "posed no threat to the officers or others until the officers initiated the arrest," that he received no warnings or explanations, and "[m]ost egregiously" that the officers "continued tasering [him] after he was effectively subdued and brought under [their] control." Id. All of those conclusions are pertinent here. Shane arguably posed no threat to the officers or others until he was tackled by Officer Eubanks, he was given no warnings or explanations, and Officer *1036 Neagle continued tasing him after he was restrained, even cuffed, and surrounded by officers.
As alluded to in Perea , an individual's mental health is another "one of the 'facts and circumstances' that 'a reasonable officer on the scene' would ascertain." Estate of Armstrong v. Village of Pinehurst , 810 F.3d 892, 900 (4th Cir. 2016) (quoting Graham , 490 U.S. at 396, 109 S.Ct. 1865 ). Officer Neagle does not allege and no evidence indicates that he altered the manner or level of his use of force based on Shane's obvious mental health struggles.
A number of other circuits have made broad pronouncements that less intrusive or de-escalation techniques are to be employed when faced with a mentally unstable individual. For example, in Bryan v. MacPherson , 630 F.3d 805, 829 (9th Cir. 2010), the Ninth Circuit explained:
[I]f [the officer] believed [the plaintiff] was mentally disturbed he should have made greater effort to take control of the situation through less intrusive means. As we have held, "[t]he problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." Deorle [v. Rutherford ], 272 F.3d [1272,] 1282-83 [ (9th Cir. 2001) ]. Although we have refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals, we have found that even "when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted ... with a mentally ill individual." Id. at 1283. The same reasoning applies to intermediate levels of force. A mentally ill individual is in need of a doctor, not a jail cell, and in the usual case-where such an individual is neither a threat to himself nor to anyone else-the government's interest in deploying force to detain him is not as substantial as its interest in deploying that force to apprehend a dangerous criminal. Moreover, the purpose of detaining a mentally ill individual is not to punish him, but to help him. The government has an important interest in providing assistance to a person in need of psychiatric care; thus, the use of force that may be justified by that interest necessarily differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community.
Similarly, in Martin v. City of Broadview Heights , 712 F.3d 951, 962 (6th Cir. 2013), the Sixth Circuit confirmed that its precedent required officers confronted with an unarmed individual exhibiting "conspicuous signs that he was mentally unstable" to "de-escalate the situation and adjust the application of force downward."[19] Again, *1037 there is no suggestion Officer Neagle took Shane's mental state into consideration as he drive stunned him over and over.
The above factors-Shane posing no immediate threat, not initiating the altercation, minimally resisting as a reaction to the officers' use of force, exhibiting signs of mental illness, and being given no warnings or explanations-substantiate the conclusion that Officer Neagle's repeated deployment of his Taser over such brief periods was unreasonable. Since Shane has met his burden of showing Officer Neagle's use of force violated his constitutional rights, I must address whether the law establishing that violation was clear as of February 14, 2014. Based on two Tenth Circuit cases- Casey v. City of Federal Heights and Cavanaugh v. Woods Cross City -I find that it was.
As it did for Officer Eubanks' conduct, Casey provides the necessary guidance for Officer Neagle's use of force. After the first officer tackled Mr. Casey, another officer arrived and, believing Mr. Casey " 'needed to be controlled,' " tased him with her Taser in dart mode. Once the officers had Mr. Casey on the ground and handcuffed, another officer drive stunned him. The court found Mr. Casey was not "violent or attempting to flee" even though he admitted he "kept trying to get up" as he was being beaten and tased. Id. at 1280, 1282. Ultimately, the court declared: "[I]t is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force-or a verbal command-could not exact compliance." Casey , 509 F.3d at 1286.
In Cavanaugh , a husband called the police for help locating his wife after they had a fight and she left their home with a kitchen knife. 625 F.3d 661, 662-63. Officers were at the house when the wife returned. Id. at 663. As she approached the house, an officer began heading in her direction. Id. She veered towards her front door and the officer followed her. Id. Without warning, the officer tased the wife in the back, and she fell on the concrete steps to her house. Id. The court held that, under those facts, the Graham factors did not justify the officer's use of his taser. Id. at 666.
Additional insight can be gleaned from Perea v. Baca , the case in which the Tenth Circuit affirmed the lack of qualified immunity for officers who tasered an individual ten times in less than two minutes. In Perea , the court unequivocally wrote that "[i]t is-and was [in 2011]-clearly established law in the Tenth Circuit that the use of disproportionate force to arrest an individual who, is not suspected of committing a serious crime and who poses no threat to others constitutes excessive force." Perea , 817 F.3d at 1204 (citing Fogarty v. Gallegos , 523 F.3d 1147, 1160 (10th Cir. 2008) ; Casey , 509 F.3d at 1281, 1285 ). Furthermore, in 2011, "disproportionate use of a taser, and repeated use of a taser against an effectively subdued individual, [were] clearly established constitutional violations .... [and] under [its] precedent, no reasonable officer could conclude that continuing to taser a subdued detainee is constitutional." Perea , 817 F.3d at 1205 n.4.
As with the subjects in Casey, Cavanaugh , and Perea , Shane was tased even though he did not initiate the physical *1038 engagement, was not threatening anyone or attempting to flee, and received no warning or explanation. Here, as well then, every reasonable official would have understood that tasering Shane repeatedly was disproportionate under the circumstances and unreasonable. The two-part test to overcome qualified immunity has been fulfilled with respect to Officer Neagle's use of force against Shane. As a result, he is not entitled to summary judgment on Shane's excessive force claim.
Officer Goodall
For her part, Officer Goodall applied a wrist-lock pain-compliance technique to Shane, in reaction-she asserts-to Shane grabbing Officer Neagle's Taser. She had just become aware that Shane had injured Officer Eubanks and knew that Shane had not yet been fully searched for weapons. Nevertheless, he was handcuffed with his hands behind his back, pressed up and away from his body, and he was surrounded by officers.
Shane has not identified a single case in which a wrist-lock or similar technique employed while attempting a pat-down has been found to be unreasonable. The cases relevant for the uses of force by Officers Eubanks and Neagle do not cover her use of force. Therefore, I find that Shane has not shown that the law was clearly established such that every reasonable officer would have known that employing the wrist-lock technique was a violation of his Fourth Amendment rights. Finding Officer Goodall is entitled to qualified immunity on that ground, I do not address whether Shane has shown her actions amounted to a constitutional violation. See Pearson , 555 U.S. at 236, 129 S.Ct. 808.
Failure to Intervene by Officers Eubanks and Goodall
On top of challenging the officers' direct uses of force, Shane claims that Officers Eubanks and Goodall violated his Fourth Amendment rights by failing to stop Officer Neagle from repeatedly tasing him. Officers "have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.' " Vondrak v. City of Las Cruces , 535 F.3d 1198, 1210 (10th Cir. 2008) (quoting Anderson v. Branen , 17 F.3d 552, 557 (2d Cir. 1994) ). Thus, "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." Mascorro , 656 F.3d at 1204 n.5 (quoting Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir.1996) ). This duty to intervene was clearly established in 2014. See Fogarty , 523 F.3d at 1162.
"Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." Vondrak , 535 F.3d at 1210 (quoting Branen , 17 F.3d at 557 ). In this case, Officers Eubanks and Goodall were present throughout Officer Neagle's repeated tasering of Shane. And, as found above, any reasonable officer should have known Officer Neagle's actions, as set forth by Shane, violated his constitutional rights. A jury could conclude that Officers Eubanks and Goodall had a realistic opportunity to prevent this use of force. The related issues of fact should, therefore, be decided at trial.
Accordingly, Officers Eubanks and Neagle are not entitled to summary judgment on qualified immunity grounds for their own uses of force against Shane. Neither are Officers Eubanks and Goodall for their failure to intervene in Officer Neagle's use of force. Summary judgment is, however, appropriate for Officer Goodall for her employment of the wrist-lock technique against Shane.
*1039 3. Glenn's Excessive Force Claim Against Officers Eubanks and Neagle
Glenn similarly asserts an excessive force claim against Officers Eubanks and Neagle. Since Glenn does not allege Officer Neagle made contact with him or seized him in any way, summary judgment is warranted for Officer Neagle.
As for Officer Eubanks, he at most shoved Glenn in the torso, forcing Glenn to fall backwards into a safe but causing no injuries. Glenn Dep. at 15:25, 17:23-18:1, 22:3-5, 22:21-23:5. "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have 'by means of physical force or show of authority, ... in some way restrained the liberty of a citizen.' " Graham v. Connor , 490 U.S. at 395 n.10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (quoting Terry v. Ohio , 392 U.S. 1, 19 n.16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham , 490 U.S. at 396, 109 S.Ct. 1865 (internal quotation marks and citation omitted). Although Officer Eubanks' shoving of an innocent bystander who he was allegedly acting to protect may reflect his overzealousness and insensitivity, it does not amount to a violation of Glenn's Fourth Amendment rights.[20] And, even if it did, Glenn points to no case with similar details that would have put Officer Eubanks on notice of that fact. Therefore, Officer Eubanks is also entitled to summary judgment on Glenn's excessive force claim.
4. Shane's False Arrest Claim Against Sergeant Allmon and Officers Eubanks, Neagle, and Goodall
In addition to his excessive force claim, Shane claims Sergeant Allmon and Officers Eubanks, Neagle, and Goodall unconstitutionally subjected him to a false arrest and unlawful seizure. "Officers may enter an individual's home without consent and conduct a warrantless arrest if both probable cause and exigent circumstances exist." United States v. Reeves , 524 F.3d 1161, 1169 (10th Cir. 2008) (citing Payton , 445 U.S. at 590, 100 S.Ct. 1371 ). I have already found that, based on the facts as presented by the Frenches, the officers' entry into the French home was without consent or the existence of exigent circumstances. In the absence of that determination, Shane's seizure still would have been unlawful, however, as the officers also lacked probable cause.
"Because an arrest is 'the most intrusive of Fourth Amendment seizures,' an arrest is 'reasonable only if supported by probable cause.' " Koch v. City of Del City , 660 F.3d 1228, 1239 (10th Cir. 2011) (quoting United States v. White , 584 F.3d 935, 945 (10th Cir. 2009) ). The probable cause inquiry is whether at the moment the arrest was made "the facts and circumstances within [the officers] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner *1040 had committed or was committing an offense." Beck v. State of Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (citations omitted). "This is an objective standard, and thus '[t]he subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive.' " Koch , 660 F.3d at 1239 (quoting United States v. Valenzuela , 365 F.3d 892, 896 (10th Cir. 2004) ). Officers who "reasonably but mistakenly conclude that probable cause is present" may still be entitled to qualified immunity. Creighton , 483 U.S. at 641, 107 S.Ct. 3034.
"[L]abeling an encounter in the home as either an investigatory stop or an arrest is meaningless" since probable cause and the existence of exigent circumstances are required for all such warrantless seizures. Reeves , 524 F.3d at 1166 (citing United States v. Saari , 272 F.3d 804, 809 (6th Cir. 2001) ). Nevertheless, throwing Shane to the ground and physically restraining him, when he did not present an immediate threat to the officers' safety and had not engaged in any suspicious activity, amounted to a custodial arrest. See Morris , 672 F.3d at 1192 ("Defendant's actions in throwing down Morris constituted an arrest, rather than a detention."). Officer Eubanks was not merely "restrain[ing] an individual in order to 'maintain the status quo during the course of a Terry stop.' " Id. (quoting Gallegos v. City of Colo. Springs , 114 F.3d 1024, 1031 (10th Cir. 1997) ).[21]
At the moment that arrest occurred, the officers were aware Patti had placed a call stating Shane was "out of control," and they knew Shane had a criminal history. They had witnessed Shane shut the door to his house and retreat upon seeing them. Upon entering the home, they could have observed that Patti and Glenn were uninjured. Afterward, Shane had taken at most a step or so in the direction the officers were headed. Officer Eubanks admits Shane did not lunge at him, French , No. 2014-CR-000040, 04/30/2014 Trans. at 58:15, and that Shane's hands were at his sides empty, French , No. 2014-CR-000040, 10/17/2014 Trans. at 46:4-13, ECF No. 55-5. Finally, when Officer Eubanks made contact with Shane, it was chest-to-chest, not the type of collision one seeking to deliberately injure an officer would have provoked. Considering these circumstances, the officers did not have information "sufficient to warrant a prudent man in believing that [Shane] had committed or was committing an offense." Beck v. State of Ohio, 379 U.S. at 91, 85 S.Ct. 223.
There is no question the law was clearly established in February 2014 that both probable cause and exigent circumstances were required for the officers to arrest Shane without a warrant in his home. As I previously discussed, any reasonable officer would have known exigent circumstances did not exist. Such a reasonable officer similarly would have understood that probable cause was lacking. See Lundstrom , 616 F.3d at 1125-26.
Therefore, Shane's false arrest and unlawful seizure claim survives Defendants' Motion for Summary Judgment.
5. Shane's Malicious Prosecution Claim Against Officers Eubanks, Neagle, and Goodall
After Shane was arrested, he was prosecuted for attempted murder, felony criminal *1041 mischief, attempting to disarm a police officer, felony obstruction, reckless endangerment, and menacing. With his malicious prosecution claim, he alleges Officers Goodall, Eubanks, and Neagle violated his constitutional rights in selecting the initial charges against him and providing the information on which they were based.
The common law of torts is generally "the starting point for determining the contours of a malicious prosecution claim under § 1983." Wolford v. Lasater , 78 F.3d 484, 489 (10th Cir. 1996) (citing Heck v. Humphrey , 512 U.S. 477, 483-84, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) ). So Tenth Circuit cases look to the following common law elements: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice, and (5) the plaintiff sustained damages.' " Wilkins v. DeReyes , 528 F.3d 790, 799 (10th Cir. 2008) (citing Novitsky v. City of Aurora , 491 F.3d 1244, 1258 (10th Cir. 2007) ). " '[T]he ultimate question,' " though, " 'is whether [the] plaintiff has proven the deprivation of a constitutional right.' " Wilkins , 528 F.3d at 797 (quoting Novitsky , 491 F.3d at 1257-58 ).
Officer Goodall
Officer Goodall selected the initial offenses charged against Shane on February 14, 2014. She asserts that she did not violate Shane's constitutional rights in doing so because probable cause supported his original arrest, continued confinement, and prosecution and there is no indication she acted with malice. See id. at 799. Although I have determined that the officers lacked probable cause to arrest Shane when Officer Eubanks tackled him to the ground and restrained him, that calculation changed as soon as Officer Eubanks realized he had been injured and believed it to be by the knives he saw in Shane's hands. Shane has made no effort to present argument or evidence demonstrating that, based on the information available after that point, each or any of the charges brought against Shane was not supported by probable cause. Specifically, he supplies no testimony or other evidence to refute Officer Eubanks' belief that a knife in Shane's possession had injured him.[22]
So too, Shane has not mustered any evidence indicating that Officer Goodall acted with malice. He relies instead on speculation and mere argument that she held bias against and disdain for him. Nothing in the record suggests that is so. "It is true that 'police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation.' " Koch , 660 F.3d at 1240 (quoting Baptiste v. J.C. Penney Co. , 147 F.3d 1252, 1259 (10th Cir. 1998) ). But Officer Goodall obtained information from each of the officers involved and articulated specific justifications for each of the charges she selected against Shane. While a prosecutor perhaps should have used discretion and narrowed or dismissed the charges, Shane has not shown that Officer Goodall acted with malice in selecting them.
Officers Eubanks and Neagle
Officers Eubanks and Neagle supplied the information on which the charges were initially selected and then prosecuted. In asserting qualified immunity for Shane's malicious prosecution claim, Officers *1042 Eubanks and Neagle challenge whether (1) their actions caused the plaintiff's continued confinement or prosecution; (2) probable cause was lacking for his original arrest, continued confinement, or prosecution; and (3) they acted with malice. See Wilkins , 528 F.3d at 799.
Shane alleges that Officers Eubanks and Neagle's "distorted narratives" caused his unconstitutional confinement and prosecution. Resp. at 29. A judicial conclusion that the evidence was sufficient to bind a defendant over for trial generally breaks the chain of causation between an officer's actions and the deprivation of a constitutional right unless there is " 'an allegation of pressure or influence exerted by the police officers, or knowing misstatements made by the officers to the prosecutor.' " Taylor v. Meacham , 82 F.3d 1556, 1564 (10th Cir. 1996) (quoting Reed v. City of Chicago, 77 F.3d 1049, 1053 (7th Cir.1996) ). A "blanket statement" that a police officer gave perjured testimony is not sufficient, however, to show a constitutional violation on the part of the officer. See Crudup v. Schulte , 12 F. App'x 682, 685 n.2 (10th Cir. 2001) (unpublished). Specificity is required, but Shane offers none.
As it did for Officer Goodall, Shane's support for the probable cause and malice elements of his malicious prosecution against Officers Eubanks and Neagle falls short. According to Shane's version of the facts, Officers Eubanks and Neagle may have acted overzealously and incompetently in responding to Patti's 911 call, but it cannot be concluded that they acted with malice in his prosecution.
Shane has failed to meet his burden to show that Officers Eubanks, Neagle, or Goodall violated his constitutional rights or "engaged in a deliberate attempt to ensure the prosecution and conviction of an innocent man." Pierce v. Gilchrist , 359 F.3d 1279, 1300 (10th Cir. 2004). The officers are consequently entitled to qualified immunity on his malicious prosecution claim, and summary judgment is appropriate.
B. The Frenches' Failure-to-Train Claim Against the City of Cortez and Official Capacity Claims
In addressing the Frenches' failure-to-train claim, I preliminarily find that the official capacity claims against Defendant Officers are duplicative of the Frenches' claim against the City of Cortez. When a plaintiff brings a claim against an officer in his official capacity, it is "another way of pleading an action against the entity of which the officer is an agent." Monell , 436 U.S. at 690 n.55, 98 S.Ct. 2018. Since the City of Cortez is the real party in interest and is named as a defendant, dismissal of the Frenches' official capacity claims against Defendant Officers is justified. See Kentucky v. Graham , 473 U.S. 159, 167 n.14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("There is no longer a need to bring official-capacity actions against local government officials, for under Monell ... local government units can be sued directly for damages and injunctive or declaratory relief.").
As for the claim brought directly against the City of Cortez, a municipal entity cannot be held liable under the doctrine of respondeat superior for the constitutional torts of its employees. Monell 436 U.S. at 691, 98 S.Ct. 2018. Instead, a municipal entity is responsible under § 1983"when execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" on which the plaintiff's claim is based. Id. at 694, 98 S.Ct. 2018. "[T]o establish a claim for damages under § 1983 against municipal entities ..., the plaintiff must prove (1) the entity executed a policy or custom, (2) that caused the plaintiff to suffer deprivation of constitutional or other federal rights."
*1043 Moss v. Kopp , 559 F.3d 1155, 1168 (10th Cir. 2009) (citing Whitesel v. Sengenberger , 222 F.3d 861, 870 (10th Cir. 2000) ). The plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Bd. of Cty. Comm'rs of Bryan Cty. v. Brown , 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).
A failure to provide proper training may constitute the policy or custom executed by the municipal entity if that failure reflects "deliberate indifference to the constitutional rights of its inhabitants." City of Canton v. Harris, 489 U.S. 378, 390-92, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Such deliberate indifference is apparent when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights." Id. at 390, 109 S.Ct. 1197.
"[P]roof of a single incident of unconstitutional activity is ordinarily not sufficient to impose municipal liability, and where a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued." Moss , 559 F.3d at 1168-69 (citing Jenkins v. Wood, 81 F.3d 988, 994 (10th Cir.1996) ). "[M]unicipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur v. City of Cincinnati , 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).
The Frenches allege the City of Cortez failed to properly train its officers in recognizing and interacting with persons with mental illness, resulting in their use of excessive force against and their unlawful arrest of Shane. The City responds that its officers are sufficiently trained in that it provides (1) annual training on its use-of-force policy, which directs officers to take into account the subject's mental state and capacity; (2) updates on that policy through daily training bulletins; and (3) a 40-hour crisis intervention training on how to identify and interact with persons with mental illness. The City maintains then that its training policy could not have been the moving force behind any constitutional deprivation. It further asserts that the Frenches have not demonstrated it acted with deliberate indifference or that the single incident on February 14, 2014, can sustain their claim.
The direct causal link between the policy and the constitutional violations alleged here are evident. The Frenches have presented evidence that there was a negative impression of Shane within the Police Department related to his mental illness and that at least Officer Eubanks could not identify any training or skills he had obtained that would aid him in identifying and interacting with mentally ill persons. Implicit in the obligation to train officers is verifying that the training has been learned and implemented. If the Department generally had a better understanding of mental illness and had administered sufficient training for its officers, perhaps the officers would have received more specific information regarding Shane's state on February 14, 2014; would not have banged so loudly on the French door or burst through it; would not have tackled and repeatedly tased Shane; would have explained the situation to him and given him warnings; and would have sought mental health treatment for him.
Police encounters with individuals struggling with mental illness are not some theoretical occurrence. The National Institute *1044 of Mental Health reports that nearly one in five adults in the U.S. lives with mental illness.[23] Countless articles and studies have been dedicated to the treatment of mentally ill individuals by law enforcement and the criminal justice system, many documenting the abuses suffered by such individuals.[24] While the Cortez Police Department provides some training to its officers, the facts presented by the Frenches show that this training was ineffective and insufficient. As a result, the Frenches have established the City acted with deliberate indifference to the constitutional rights of its inhabitants as "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights." City of Canton , 489 U.S. at 390, 109 S.Ct. 1197.
With respect to the City's argument that it cannot be held liable based on a single incident, I agree with the Frenches that the facts cited are not limited to one event. Chief Lane confirmed that an attitude developed over time regarding Shane and his mental struggles. The mindset was so pervasive that it permitted at least five officers to stand by while Shane was repeatedly tased as he told them he had mental problems. And regardless:
In leaving open in [City of ] Canton [v. Harris ] the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, [the Supreme Court] ... hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice-namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation-that the municipality's indifference led directly to the very consequence that was so predictable.
Brown , 520 U.S. at 409-10, 117 S.Ct. 1382. Based on the evidence put forward by the Frenches, this case fits squarely within those narrow circumstances. It was and is likely that Cortez police officers will encounter mentally ill individuals and that, if the officers do not receive adequate training, the individuals' Fourth Amendment rights will be violated. For these reasons, the Frenches' claim against the City withstands the Defendants' Motion for Summary Judgment.
C. The ADA Claim Brought by Glenn and Shane Against Officer Eubanks
The final claim asserted is brought under the Americans with Disabilities Act, which provides: "[N]o qualified individual with a disability shall, by reasons of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."
*1045 42 U.S.C. § 12132. Officer Eubanks rightfully argues that he is not subject to suit in his individual capacity under the ADA. See Montez v. Romer , 32 F.Supp.2d 1235, 1241 (D. Colo. 1999). Glenn and Shane make no attempt to challenge this principle. Thus, I find judgment as a matter of law on Glenn and Shane's ADA claims is warranted.
IV. Conclusion
Accordingly, Defendants' Motion for Summary Judgment (ECF No. 49) is GRANTED IN PART in that summary judgment shall enter: against Glenn and for Officers Eubanks and Neagle on his excessive force claim; against Shane and for Officers Eubanks, Neagle, and Goodall on his malicious prosecution claim; and against Glenn and Shane and for Officer Eubanks on their ADA claim. The Frenches' official capacity claims against Chief Lane, Sergeant Allmon, and Officers Eubanks, Neagle, and Goodall are DISMISSED. Consequently, Chief Lane is DISMISSED as a defendant in this case. The Motion for Summary Judgment is otherwise DENIED.

Defendant Jennifer Lodge is now Jennifer Goodall.

The Frenches argue in their Response to the Motion for Summary Judgment that Sergeant Allmon failed to intervene while Officer Neagle used excessive force. Resp. at 27, ECF No. 55. However, they agreed to dismiss the individual capacity excessive force claims against Sergeant Allmon, and so they were dismissed. Stipulation for Dismissal at 2, ECF No. 48; Order on Stipulation at 1, ECF No. 50.

I list here the claims against the officers in their individual capacities only because the Frenches' claims against the officers in their official capacities are duplicative of the claim brought against the City of Cortez. See Monell v. Dep't of Soc. Servs. of City of New York , 436 U.S. 658, 690 n.55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (explaining that when a plaintiff brings a claim against an officer in his official capacity, it is "another way of pleading an action against the entity of which the officer is an agent"). The claims remaining for Chief Lane are brought against him in his official capacity only, so he is not named in this summary.

Throughout the briefing and their affidavits, the individual Defendants repeatedly assert that "[p]rior to the commencement of this litigation, none ... were aware that Shane claimed to have a mental disability." See, e.g. , Mot. at 13. This parsing of language is infuriating. It is irrelevant whether they knew he "claimed" to have a "mental disability." They were familiar with Shane and his family, had interacted with him on previous occasions, and/or were aware he struggled with mental health problems. See, e.g., Colo. v. French , No. 2014-CR-000040, 04/30/2014 Trans. at 74:23-75:6, ECF No. 55-3.

In May 2002, Shane was also arrested for first-degree assault on a peace officer and second-degree assault involving a vehicle but was found not guilty after a jury trial. Patti Dep. at 151: 11-19.

Glenn was in a mining accident in 1973 that left him completely blind. Glenn Dep. at 6:16-23.

Officers Eubanks and Neagle have claimed that Officer Eubanks yelled "knife" and "let go" several times when he saw the two knives in Shane's hands. Eubanks Aff. at 4; Eubanks Incident Report at 1; French , No. 2014-CR-000040, 10/17/2014 Trans. at 111:13, ECF No. 55-7 (Officer Neagle heard Officer Eubanks yell "knife"). It seems they have abandoned that story for their Motion for Summary Judgment.

"A taser has two functions, dart mode and drive stun mode. In dart mode, a taser shoots probes into a subject and overrides the central nervous system. In drive stun mode, the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim. In this mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system[.] Drive stun mode is used as a pain compliance tool with limited threat reduction." Estate of Booker v. Gomez , 745 F.3d 405, 414 (10th Cir. 2014) (internal quotation marks and citations omitted).

The version of the February 14, 2014 events put forward by Defendants differs substantially from the facts I describe here, primarily due to the fact that the officers' testimony contradicted other evidence in the record more favorable to the Frenches, including the officers' own statements. That being so, the following representations made by Defendants are disputed and must be rejected for the purposes of summary judgment.
• Officers Eubanks and Neagle heard shouting from multiple voices in the French home before entering it, and at least one of the voices was female. Compare Eubanks Aff. at 2 (swearing at least one female voice was shouting), Neagle Aff. at 2-3 (same), and Eubanks Dep. at 110:13-15, ECF No. 61-1 (testifying to hearing male and female voices screaming), with id. at 11:25-12:2, ECF No. 55-8 (testifying to only a male voice being heard), and Eubanks Incident Report at 1-2, ECF No. 55-4 (including no statements regarding shouting inside home).
• Officer Eubanks announced the presence of the police. Compare Eubanks Aff. at 3, with Patti. Dep. at 77:1-2, 183:12-15, ECF No. 49-1, and French , No. 2014-CR-000040, 12/04/2014 Trans. at 31:13-18.
• The door was opened by Patti or perhaps Glenn, and the officers entered out of concern for Patti and Glenn's safety. Compare Eubanks Aff. at 3, and Neagle Aff. at 3, with Eubanks Incident Report at 1, ECF No. 55-4 (claiming Glenn opened the door, but containing no mention of or support for the existence of exigent circumstances), Patti Dep. at 78:14-18, and Glenn Dep. at 16:7-13.
• The damage to the doorframe and wall were not caused by Officer Eubanks.
• Officer Eubanks did not make physical contact with Glenn as he moved into the home. Compare Eubanks Aff. at 3, with Glenn Dep. at 15:24-25, 17:21-18:3.
• Upon entering, Officer Eubanks asked Patti where Shane was. Compare Eubanks Dep. at 11:21-22, 16:9-11, ECF No. 55-8, with Patti Dep. at 82:16-25, and French , No. 2014-CR-000040, 12/04/2014 Trans. at 39:19-23.
• The officers heard loud footsteps and observed Shane French rushing at them. Compare Eubanks Aff. at 3 (Officer Eubanks was moving towards the kitchen and back hallway when heard footsteps), and Neagle Aff. at 3 (Officer Neagle was behind Eubanks moving towards the kitchen and back hallway when heard footsteps), with Eubanks Dep. at 16:13-25, ECF No. 55-8 (Officer Eubanks was at the threshold when heard footsteps), and Patti Dep. at 82:1-13, 165:17-23.
• Officer Neagle announced Taser while Shane was on the floor before administering the drive stuns. Compare Neagle Aff. at 4, and Eubanks Aff. at 4, with Eubanks Dep. at 103:3-6, ECF No. 55-8 (stating he does not remember verbal warnings being given before Taser was used), and French , No. 2014-CR-000040, 10/17/2014 Trans. at 111:5-7, ECF No. 55-7 (Officer Neagle un-holstered his Taser while Shane and Officer Eubanks were still standing).
• Shane attempted to gain control of Officer Neagle's Taser. Compare Neagle Aff. at 5, and Goodall Aff. at 3, with Body Camera Video at 04:36-07:27 (documenting Shane's cuffed hands pressed up to his shoulders with officers surrounding him).

Patti has provided conflicting statements on whether she opened the door or just went to it, Compare Patti Dep. at 78:14-18; with Colorado v. French , No. 2014-CR-000040, 10/17/2014 Trans. at 215:5-7, ECF No. 49-10, and Officers Eubanks and Neagle insist that she opened it. I assume for the purposes of summary judgment that Patti only went to the door, but even if she had opened it, doing so would not constitute consent. Merely opening a door does not extinguish an occupant's right to then refuse entry to an officer. See King , 563 U.S. at 469-70, 131 S.Ct. 1849 ; Roybal v. City of Albuquerque , No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *13 (D.N.M. Apr. 28, 2009) ("The situation is not much different from someone opening the front door of a house to speak with an officer at the door, and it is clear that answering the door does not serve to allow a police office[r] to conduct a warrantless search.").

The instant facts are obviously distinct from those in which an occupant reports a crime and interacts with the officers before they enter the premises. See, e.g. , Johnson v. State , 226 S.W.3d 439, 444 (Tex. Crim. App. 2007) ; State v. Flippo , 212 W.Va. 560, 575 S.E.2d 170, 183 (2002) ; Commonwealth v. Witman , 750 A.2d 327, 335 (Pa. Super. Ct. 2000). But even in those cases, the search must be objectively reasonable and within the scope of the consent as the investigation unfolds. No argument can be made that reasonable officers would have believed Patti, by calling for assistance with her "out-of-control" son and not reporting any crime, consented to the events that followed.

While the defense of qualified immunity places the burden on the plaintiff to demonstrate that the defendant violated his clearly established constitutional rights, the Tenth Circuit looks to the criminal context and shifts the burden back to the defendant when exigent circumstances are alleged. See, e.g. , Mascorro , 656 F.3d at 1205 ; Lundstrom , 616 F.3d at 1124 ; Armijo v. Peterson , 601 F.3d 1065, 1070 (10th Cir. 2010).

It is unclear from the record whether the officers were told that the reason for Patti's call was to obtain a mental health hold for Shane or that Shane was not acting violently. It seems likely that some of this information was conveyed, since they were aware of Patti's request that they arrive at the home with their lights and sirens turned off. However, I cannot and do not rely on it in assessing whether reasonable officers would have deemed exigent circumstances to exist.

The officers presumed that, because Shane had acted erratically in the past, those near him were in need of immediate aid. Such a presumption is impermissible. I do not rule out the possibility that exigent circumstances could exist when a perpetrator has a modus operandi and it is clear to responding officers that the corresponding events are playing out. That is not the case here. The officers make no representations that Shane was acting as he had when previously assaultive or dangerous.

Cf. United States v. Martin , 613 F.3d 1295, 1304 (10th Cir. 2010) ("The officers didn't go barreling in and rummaging through the apartment searching for him ... The officers neither forced their way in nor even drew their weapons.").

I recognize that "[u]npublished decisions are not precedential, but may be cited for their persuasive value." 10th Cir. R. 32.1(A). Dalcour is persuasive with respect to the law being clearly established not because the case itself clearly established the law by finding that a constitutional violation had occurred under similar circumstances, but because it held that based on prior precedent the law with respect to that similar constitutional violation was already clearly established in 2012. 492 F. App'x at 933-34

Significantly, the Tenth Circuit has recently "decline[d] to hold ... that all calls to police involving allegations of domestic violence entitle officers to respond with substantial force." Lee v. Tucker , 904 F.3d 1145, 1149 (10th Cir. 2018). So the fact that the officers might have construed Patti's call as domestic did not entitle them to respond with substantial force, especially in this case where allegations of violence were specifically negated.

The court even recognized in Casey that, because of the fact-specific inquiry required, "there will almost never be a previously published opinion involving exactly the same circumstances." Casey , 509 F.3d at 1284. But the absence of such an opinion does not preclude a finding that the law was clearly established and so the officer is not entitled to qualified immunity. Id. at 1285.

Additionally, in its product warnings in 2013, Taser International-the maker of the Taser used by Officer Neagle-cautioned that: "Drive-stun use may not be effective on emotionally disturbed persons or others who may not respond to pain due to a mind-body disconnect." Cheryl W. Thompson and Mike Berman, Deaths Spotlight Use of Tasers for Pain Compliance Against the Mentally Ill , The Washington Post (Nov. 26, 2015). Users were further directed to "[a]void using repeat drive-stuns on such individuals if compliance is not achieved." Id. Two years before that explicit warning from the company, the Police Executive Research Forum in partnership with the U.S. Department of Justice concluded that using an electronic control weapon or Taser "to achieve pain compliance may have limited effectiveness and, when used repeatedly, may even exacerbate the situation by inducing rage in the subject." 2011 Electronic Weapon Control Guidelines, Police Executive Research Forum and Community Oriented Policing Services, U.S. Dep't of Justice, at 14, 19 (March 2011). Thus, the organizations' guidelines regarding such weapons recommended that agencies discourage their use in the drive stun mode as a pain-compliance tactic. Id. A reasonable officer should likely have taken into account such information regarding the weapon he was deploying.

Although not raised by Defendants, it is unclear whether the force used against Glenn amounts to a seizure for Fourth Amendment purposes. As explained by the Supreme Court in Brower v. County of Inyo , 489 U.S. 593, 596-97, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), a Fourth Amendment seizure does not occur "whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby) ..., but only when there is a governmental termination of freedom of movement through means intentionally applied ." The Tenth Circuit applied this principle in Clark v. Edmunds , 513 F.3d 1219, 1222 (10th Cir. 2008), and held that a sheriff's push of a mother to clear his path while taking her daughter into custody did not amount to a seizure under the Fourth Amendment.

"While there is no litmus-paper test for determining when an investigative detention enters the realm of an arrest, we have stated an arrest is distinguished from an investigative detention by the involuntary, highly intrusive nature of the encounter. The use of firearms, handcuffs, and other forceful techniques, for example, generally indicate an investigative detention has evolved into an arrest." Lundstrom , 616 F.3d at 1120 (internal quotation marks, citations, and alterations omitted).

Via argument, Shane insists that Officer Eubanks was injured by his own equipment and stresses that no DNA test was performed on the knives to confirm they caused the cut on Officer Eubanks' side. Such is not evidence and cannot create a dispute of fact or demonstrate the officers ignored the facts and acted with malice.

Mental Illness Statistics , Nat'l Inst. Mental Health, https://www.nimh.nih.gov/health/statistics/mental-illness.shtml (last visited Jan. 9, 2019).

See, e.g. , Robert Rigg, "Are There No Prisons?" Mental Health and the Criminal Justice System in the United States , 4 U. DENV. CRIM. L. REV. 103 (2014) ; Doris J. James, Mental Health Problems of Prison and Jail Inmates , Bureau of Justice Statistics, Dep't of Justice (Sept. 2006), available at https://www.bjs.gov/content/pub/pdf/mhppji.pdf.